UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE OCUGEN, INC. SECURITIES LITIGATION | **Case No: 2:24-cv-01500-KBH** |
| | <u>**CLASS ACTION**</u> |
| THIS DOCUMENT RELATES TO: | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Case No: 2:24-cv-01500-KBH – PATTERSON | <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Farhan Beig and plaintiff Stephen Gary Mansfield ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Ocugen Inc. ("Ocugen" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Ocugen securities between May 8, 2020 and April 1, 2024, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ocugen is a small biopharmaceutical company with approximately 80 employees or less at all relevant times. During the Class Period, the Company was focused on developing

gene therapies to address retinal diseases, among other things.

3. At all relevant times, the Company struggled financially. Ocugen incurred recurring net losses and negative cash flows since its inception. The Company's recurring losses consistently raised substantial doubt about Ocugen's ability to continue as a going concern. At all relevant times, the Company had not generated any revenues from the sale of its products and had to fund its operations through the sale of common stock, warrants to purchase common stock, the issuance of convertible notes, debt, and grant proceeds. To date, Ocugen has not successfully developed or commercialized a single pharmaceutical product.

4. Notwithstanding its grim financial picture, financial analysts credited Defendants' false representations and were therefore optimistic about the Company.

5. Throughout the Class Period, Defendants made materially false and misleading statements and/or failed to disclose that Ocugen's internal control over financial reporting and disclosure controls and procedures were not effective, and as a result, it failed to properly account for its co-development and commercialization agreement with CanSino Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of the Company's modifier gene therapy product candidates for retinal diseases – OCU400, OCU410, and OCU410ST.

6. Ocugen failed to apply the appropriate authoritative accounting guidance to the CanSinoBIO agreement and, consequently, failed to account for this agreement by analogy to the revenue recognition guidance and provide appropriate disclosures in Ocugen's financial statements. Through improper application of the U.S. generally accepted accounting principles, ("U.S. GAAP"), Ocugen was able to embellish its financial statements by significantly understating its current liabilities and accumulated deficit, overstating its stockholders' equity, and

understating its research and development expenses, losses from operations, net losses, and losses per share.

7.     Defendants' motive for intentionally inflating the Company's financials was to continue raising significant additional capital through securities offerings to fund the Company's operations.  Without significant additional capital, the Company was doomed.

8.     Additionally, during the Class Period, Defendant Shankar Musunuri, the Company's CEO, lied to investors with respect to forecasting. When Musunuri and Arun Upadhyay, the Company's Chief Scientist, were provided with forecasts from the finance department that did not match with their goals, they fabricated numbers and estimates to extend the Company's cash runway.

9.     The revised forecasts, put together by Musunuri and Upadhyay, were then used as the actual numbers provided in some of the quarterly earnings conference calls that took place and in corporate decks being used by investor relations and filed with the SEC. There were times the forecasts contradicted the forecasts that were put together by the finance department.

10.     Following Chief Accounting Officer Jessica Crespo's showdowns with Musunuri about the proper reporting of forecasts, the Company announced in a Form 8-K filed with the SEC on March 10, 2023, that Crespo resigned on March 7, 2023. She was replaced by CFO Quan Vu. But within months of his appointment as CFO, he began showing signs of stress.

11.     In July or August 2023, CFO Vu had a run-in with Musunuri because he informed Musunuri that he refused to sign the Q2 2023 10-Q due to misrepresentations in the Company's financials.  After that, no more than a few weeks passed when Vu was fired in August 2023 because of his refusal to sign the Q2 2023 10-Q and was walked out of the office by security.

12.    After Vu's termination, senior executives, including Musunuri, approached others in the finance department demanding they sign the Q2 2023 10-Q.  Andrew Walsh, VP of Finance, was asked to sign but refused to do so.  Walsh was also fired a few weeks later.  After Walsh, Jaiby Abraham, who was then Manager, Financial Reporting, was approached to sign. The appeal to sign the Q2 2023 10-Q came from Shankar Musunuri.  Musunuri met with Abraham in her office in mid-to-late August 2023.  When his initial request to her to sign failed, Musunuri appealed to her again based on their shared Indian heritage.  But Abraham still refused to sign the Q2 2023 10-Q.

13.    On August 15, 2023, after the market closed, the Company filed a Form 8-K with the SEC signed by Defendant Musunuri stating that CFO Vu was no longer with the Company.

14.    That same day, after the market closed, the Company also filed a Notification of Late Filing on Form 12b-25 with the SEC with respect to the Q2 2023 10-Q.

15.    The Company's August 15, 2023 announcements, along with the Company's disclosure of Crespo's resignation just five months earlier on March 10, 2023, signaled to investors and the market in general that there were undisclosed problems at the Company related to its financials.

16.    On this news, Ocugen's stock fell $0.04 per share, or 8.3%, to close at $0.44 per share on August 16, 2023, damaging investors.

17.    On April 1, 2024, after the market closed, Ocugen announced in a Form 8-K filed with the SEC that its *Q1 2020 through Q3 2023 financial statements*, as well as the associated earnings releases and investor presentations or other communications describing such financial statements, *were materially misstated and should no longer be relied upon* due to identified errors relating to the Company's accounting for the estimated costs in a collaboration arrangement.  The

collaboration agreement was the CanSinoBIO agreement.

18.     The April 1, 2024 Form 8-K further disclosed that the identified errors would result in a restatement and "***that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023.***" As a result, the Company concluded that its ***disclosure controls and procedures were not effective as of December 31, 2023.***

19.     On this news, Ocugen's stock fell $0.16 per share, or 10.38%, to close at $1.38 per share on April 2, 2024, damaging investors.

20.     The Company issued the restated financial statements in its 2023 10-K filed with the SEC on April 16, 2024.  The balance sheet impact of the restatement due to improper accounting for the collaborative arrangement ***was to increase current liabilities and decrease stockholder's equity by increasing accumulated deficit*** (*i.e.*, accumulated net losses from prior periods).  For example, with respect to the restated periods, Ocugen's current liabilities were understated by as much as **35.3%-45.1%**; stockholder's equity was overstated by **4.5%-18.6%**; and accumulated deficit was understated by **3.1%-4.8%**.

21.     The improper accounting for the collaborative arrangement also affected the Company's current ratio, which is calculated as the ratio of current assets to current liabilities. Current ratio is a liquidity ratio that measures a company's ability to pay short-term obligations or those due within one year.  Investors use current ratio to assess the financial health of a company. Companies with a high current ratio are well positioned to pay their debts in the short-term, while companies with a low current ratio may be at risk of default.  Based on the restatement, ***Ocugen's current ratio was overstated*** by as much as **54.6%-82.0%** for all restated periods.

22.    The impact to the Income Statement as a result of its improper accounting for the CanSinBIO agreement *was largely to increase R&D expenses, loss from operations, net loss, and loss per share*, among other things.[1]

23.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

24.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

26.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

27.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

28.    Lead Plaintiff Farhan Beig, as set forth in his previously filed certification

---

[1] "Income Statement" refers to any consolidated statements of operations and comprehensive loss filed in the Company's Form 10-Qs or Form 10-Ks or any consolidated statements of operations filed in the Company's Form 8-Ks.

incorporated by reference herein, purchased Ocugen securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

29.     Plaintiff Stephen Gary Mansfield, as set forth in the accompanying certification incorporated by reference herein, purchased Ocugen securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

30.     Defendant Ocugen is a biotechnology company. It is incorporated in Delaware and its headquarters is located at 11 Great Valley Parkway, Malvern, Pennsylvania 19355. Ocugen's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "OCGN."

31.     Defendant Shankar Musunuri ("Musunuri") served as the Company's Chief Executive Officer ("CEO") throughout the Class Period, as well as the interim principal financial officer at times specified below. He co-founded Ocugen in 2013.  He also serves as Chairman of the Board of Directors (the "Board").

## NON-PARTIES

32.     Sanjay Subramanian ("Subramanian") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until March 18, 2022. Subramanian reported directly to Defendant Musunuri.

33.     Jessica Crespo ("Crespo") served as the Company's Chief Accounting Officer and Senior Vice President, Finance from March 18, 2022 until March 7, 2023. She reported directly to Defendant Musunuri.

34.     Quan Vu ("Vu") served as the Company's CFO and Chief Business Officer from March 6, 2023 until August 14, 2023. He reported directly to Defendant Musunuri.

35.     Michael Breininger ("Breininger") served as the Corporate Controller, interim Chief

Accounting Officer, and Principal Financial Officer from September 15, 2023 to the present. He reported directly to Defendant Musunuri.

36.     Defendant Musunuri:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

37.     Ocugen is liable for the acts of Defendant Musunuri and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

38.     The scienter of Defendant Musunuri and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

39.     Ocugen and Defendant Musunuri are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

40.     Ocugen is a small biopharmaceutical company with approximately 80 employees or less at all relevant times. During the Class Period, the Company was focused on developing gene therapies to address retinal diseases, among other things.

41.     Defendant Musunuri is the co-founder, CEO and Chairman of the Board. He controls the Company.

42.     To date, Ocugen has not successfully developed or commercialized a single pharmaceutical product.

### A.     THE COMPANY WAS IN DIRE FINANCIAL STRAITS AND THERE WAS ALWAYS A QUESTION ABOUT THE COMPANY'S ABILITY TO CONTINUE AS A GOING CONCERN

43.     Throughout the Class Period, the Company struggled financially. Ocugen incurred recurring net losses and negative cash flows from operations since its inception. The Company's recurring losses consistently raised substantial doubt about Ocugen's ability to continue as a going concern. At all relevant times, the Company had not generated any revenues from the sale of its products and had to fund its operations through the sale of common stock, warrants to purchase common stock, the issuance of convertible notes, debt, and grant proceeds.

44.     Ocugen had an extremely short cash runway at all relevant times. Throughout the Class Period, Ocugen announced that with its anticipated continued spending to develop products, the Company would need to raise significant additional capital to fund its future operations.

45.     As of December 31, 2019, just before the start of the Class Period, the Company had cash, cash equivalents, and restricted cash totaling just $7.6 million. By the Company's own admission, Ocugen's cash position was only sufficient to fund operations into mid-2020.

46.    Through multiple subsequent stock issuances, Ocugen was able to fund its operations and increase the balance of its cash on hand.

47.    As of December 31, 2020, the Company had only $24.2 million in cash, cash equivalents, and restricted cash. As of December 31, 2021, the Company had a cash, cash equivalents, and restricted cash balance of $95.1 million. By the Company's own admission, Ocugen's cash position was insufficient to meet its capital requirements during the subsequent twelve-month period. As of December 31, 2022, the Company had a cash and cash equivalents balance of $77.6 million. Again, by the Company's own admission, Ocugen's cash position was insufficient to meet its capital requirements during the subsequent twelve-month period.

48.    Desperate for cash, in May 2023, Ocugen sold 30 million shares of its common stock at a public offering price of $0.50 per share. The Company received only $14.8 million in net proceeds. Additionally, after the Company launched the May 2023 public offering, Ocugen's stock price plunged 36% in the following days. As of December 31, 2023, the Company had a cash and cash equivalents balance of $39.5 million. Again, Ocugen's cash position was insufficient to meet the Company's capital requirements over the subsequent twelve-month period.

**B.    ANALYSTS WERE OPTIMISTIC ABOUT THE COMPANY NOTWITHSTANDING ITS FINANCIAL STRUGGLES**

49.    Notwithstanding the Company's financial struggles throughout the Class Period, analysts were issuing optimistic reports as to Ocugen's stock price potential. For example, on November 10, 2020, Chardan Capital Markets ("Chardan"), published an analyst report titled, "OCGN (Buy, PT $0.70): Making steady progress towards the clinic." The Chardan report stated that Ocugen remained on track to advance its lead gene therapy product candidate, OCU400. Notably, the Chardan report rated Ocugen's stock as a "Buy"—indicating an expected total return of at least 10% over the subsequent 12-month period.

50. Additionally, on May 9, 2022, Noble Capital Markets ("Noble"), published an analyst report titled, "Ocugen First Quarter Reported With Gene Therapy Programs Making Progress." Noble stated that the Company's Q1 2022 financial results were within expectations and progress had been made in Ocugen's gene therapy programs. The report highlighted that Ocugen planned to have all three of its gene therapy products in clinical trials during 2023. Noble even reiterated its $15 per share price target at a time Ocugen shares were trading at just $2.16 per share.

51. On March 27, 2023, Cantor Fitzgerald published an analyst report titled "Ocugen Inc. (OCGN): Eyeing The Pediatric Opportunity For OCU400; FDA Allows Pediatric Patients In Phase 1/2 Trial." Notably, Cantor Fitzgerald believed that the peak sales potential of Ocugen's diverse pipeline was *under appreciated*. Based on the pipeline, Cantor Fitzgerald expected revised earnings estimates to move Ocugen's stock price even higher. On May 30, 2023, Cantor Fitzgerald published another analyst report titled, "Ocugen Inc. (OCGN) Company Update." The report stated that the Company was "well-positioned to continue executing on its key clinical programs."

52. And as late as January 24, 2024, H.C. Wainwright published an analyst report titled, "Ocugen, Inc. (OCGN): Entering a Year of Execution; New $7 PT; Reiterate Buy." H.C. Wainwright was encouraged by OCU400's "positive Phase 1/2 data" and noted projected revenues of $458 million for the drug by 2030. At the time, Ocugen shares were trading at just $0.53 per share. However, H.C. Wainwright provided a price target of $7 per share based on Ocugen's optimistic outlook.

### C.    THE COMPANY WAS PLAGUED BY FRAUD AND OTHER PROBLEMS

#### 1.    Musunuri Refused to Revise Financial Projections When Changes in Circumstances Increased Costs in Clinical Trials and Lied to Investors

53.    Confidential Witness ("CW") No. 1 worked at Ocugen's headquarters in Malvern, Pennsylvania from February 2022 through September 2023 as Financial Planning and Analysis Manager. CW-1 reported to Frank Clifford, the head of Financial Planning and Analysis.

54.    CW-1's responsibilities primarily related to Ocugen's clinical teams and research and development group ("R&D"). CW-1 prepared forecasts on expected costs for drug development that were sent to Musunuri.  Clifford and Jess Crespo, the Chief Accounting Officer, saw CW-1's forecasts as well. The forecasts were based on information such as the costs per patient in the clinical studies, numbers provided to CW-1 from R&D, and calculations of costs based on research timelines.  CW-1's forecasts were usually used to establish the Company's cash runway.

55.    The date for the initiation of trials often changed which required changes in the Company's financial estimates. For example, CW-1 stated that "[i]f you told me that a trial is going to start tomorrow and that the FDA requires it to last a year, then that is the timeline."  "Whatever estimates or forecasts are put together show the financial results for a year from tomorrow." "But if the trial has issues that lead it to be rescheduled to start three months later, you have to shift the timeline to 15 months from now." But Musunuri and Chief Scientific Officer Arun Upadhyay ("Upadhyay") "pushed back on that and insisted we forecast estimates based on the original study timeline.  So rather than a year required by the FDA, [Musunuri and Upadhyay] wanted to make calculations based on the study lasting nine months."

56.    When CW-1 provided forecasts to Musunuri and Upadhyay, the two men became furious because the information did not match with their goals.  Rather than sending the forecasts back to the finance department, ***Musunuri and Upadhyay came up with their own numbers and estimates without any basis for doing so***.  CW-1 stated: ***"They pulled the timelines and other figures out of their a\*\*es."***

57.    The revised forecasts, put together by Musunuri and Upadhyay, were then used as the actual numbers provided in some of the quarterly investor calls that took place during CW-1's tenure. Indeed, CW-1 stated: ***"There were times the forecasts they used in the investor calls contradicted the forecasts we put together in the finance department."***

58.    "For the going concern numbers, they wanted to show that they had 12 months [worth of available cash], but I don't believe it was feasible without a major injection of cash," CW-1 said.  ***"They were getting their cash runway to extend further than it was."***

59.    CW-1's forecast also included information about OCU400, which is the Company's modifier gene therapy product candidate for retinal diseases. As discussed herein, CanSinoBIO is the collaborator with respect to the development and commercialization of the product candidate.

60.    According to CW-1, ***Musunuri and Upadhyay used numbers in the projection of time for completion of the OCU400 study that ignored actual recruitment results***.  Phases 1 and 2 of the Phase 1/2 trial for OCU400 required 18 patients but enrollment in 2022 and 2023 was extremely slow (as there are not a lot of subjects in the United States with the targeted diseases).

61.    The real forecast incorporated those delays in enrollment but Musunuri and Upadhyay overruled those numbers and instead kept the original timeline for completion of the trial even though it was impossible to reach. "Musunuri and Upadhyay said that the estimated time

to reach full enrollment was not to be moved." "They kept their timelines with extremely tight enrollment deadlines which, of course, never came true," CW-1 stated. "They kept it condensed even though it wasn't." And despite the troubles they had meeting the timeline for enrolling 18 subjects in Phases 1/2 of the trial, they kept the same timeline for phase 3, which required recruiting 150 patients. They kept saying they could make it in a month but that would be impossible.  CW-1 stated: ***"They kept constricting timelines that could not be hit and if you look at the results, they knew they couldn't be hit."***

62.    CW-1's forecasts led to either Musunuri or Upadhyay or both shutting down CW-1's access to R&D, the division where CW-1 needed to get the information to prepare the assessments. When they "found out that I had a forecast that didn't match their goals, I wasn't allowed to speak to that division anymore." Soon after, all of CW-1's meetings with the clinical trials division were taken off the calendar, and Clifford (instead of CW-1) had to gather the information from R&D and clinical trials so that financial forecasts could continue.

63.    When Musunuri stated numbers in a quarterly earnings conference call that contradicted the finance department's projections, CW-1 and Clifford, the head of Financial Planning and Analysis, wrote a 20-page report shortly before March 2023 spelling out in detail what was wrong with the forecasts being provided to the public and the risks of using those manipulated numbers.[2]  CW-1 stated that the report was sent by email to Jess Crespo, the Company's Chief Accounting Officer, to ensure it could not be destroyed without leaving some sort of digital evidence. The report "showed an enormous amount of risk in what they were presenting."  "We also wanted to give Jess [Crespo] a heads up on what was going on."

---

[2] It appears that the quarterly earnings conference call in question was likely the Company's earnings conference call held on February 27, 2023.

64.     While CW-1 did not know the full extent that fabricated numbers were being reported, CW-1 was certain they were appearing in corporate decks being used by investor relations and filed with the SEC.

65.     All of this led to a meeting in Musunuri's office in or about early March 2023 with Musunuri and Upadhyay on one side and Clifford, Crespo, and a few other finance executives on the other side.  When the finance executives returned, they met with CW-1 in one of their offices. "Jess and Frank came back furious," according to CW-1. "It was really a bad moment for them. They were both berated by [Musunuri and Upadhyay] for not towing the company line." Crespo was particularly angered.  "She believed the numbers we approved; she believed the forecasts we were putting out."  CW-1 stated: "She resented being put on the spot to get reprimanded."

66.     According to CW-1, the key problem for the Company in changing the forecast were adjustments in the projected cash runway.  CW-1 stated that Clifford, Crespo and CW-1 reexamined the projected cash runway to see how much further out it could be stretched in an attempt to appease Musunuri and Upadhyay but the best they could do was stretch out the time just a little bit which once again infuriated Musunuri and Upadhyay.

67.     Following Crespo's showdowns with Musunuri and Upadhyay about the proper reporting of forecasts, the Company announced in a Form 8-K filed with the SEC on March 10, 2023, that Crespo resigned on March 7, 2023, to pursue new opportunities.[3] She was replaced by CFO Quan Vu.  But within months of his appointment as CFO, he began showing signs of stress.

---

[3] Ocugen further stated that Crespo's resignation was not due to any disagreement or dispute with the Company or the Board. However, on May 17, 2024, after the Class Period, Ocugen disclosed in a preliminary proxy statement filed with the SEC that Crespo's resignation was treated as a resignation for "good reason" pursuant to her employment agreement.

## 2. CFO Vu Refuses to Sign the Company's Q2 2023 10-Q Because of Misrepresentations in the Company's Financials and Was Terminated

68.     In July or August 2023, Vu stopped by CW-1's desk to say he had a run-in with Musunuri because he had informed the CEO he would not sign the Q2 2023 10-Q. After that, no more than a few weeks passed when CW-1 saw members of security come into the finance department and walk in Vu's office. Vu was fired because of his refusal to sign the Q2 2023 10-Q and security walked him out.

69.     CW-2 worked at Ocugen as Executive Liaison/Assistant to Chief Accounting Officer Jessica Crespo from May 2022 through March 2023, and then to CFO Vu from March 2023 through August 2023. CW-2 worked at the Company headquarters in Malvern, Pennsylvania and reported to Megan Kelly (formerly Megan Rodriguez) who was the full-time Executive Assistant to Musunuri.

70.     As the Executive Assistant to CFO Vu, CW-2 was in a unique position in that CW-2 was a confidante of Vu and multiple people in the finance department spoke to CW-2 about events taking place. CW-2 also periodically worked for Musunuri and was able to see and frequently hear him because CW-2's desk was near Musunuri's office and Musunuri had glass walls.

71.     CW-2 stated that Vu discovered something deeply disturbing involving what CW-2 understood to be misrepresentations to the public. CW-2 stated that in late May/early June 2023, Vu met with CW-2 in Vu's office and stated that, after speaking with members of the R&D team and reviewing the Company's financials, there were multiple things that were wrong and the Company was misleading the public. Vu told CW-2 that something did not add up. CW-2 quoted Vu as saying, "I went to a lawyer, there is going to be an investigation of finance and R&D because I learned something that isn't right, and I can't live with myself if I allow it to continue without

16

saying something."

72.    Vu also told CW-2 at the late May/early June 2023 meeting, or subsequent thereto, that Vu alerted the Board to his discovery and CW-2 believed the Board contacted Ernst & Young to conduct an investigation.

73.    Because Vu knew how Musunuri reacted when facing opposition, he refused to tell CW-2 or anyone else what misrepresentations he had discovered and why it was so serious. According to CW-2, "[h]e wouldn't talk about the details of why he was so upset so that no one else was in the line of fire."  "[Vu] knew that that as soon as he launched this investigation that anyone connected to him was in the line of fire, so he wanted to give them deniability…. [H]e had a sense of responsibility for his staff."

74.    In mid-June 2023, Musunuri cut off all communication with Vu and CW-2. Musunuri's behavior made clear that both Vu and CW-2 had "targets on our backs."  According to CW-2, Musunuri "likes to retaliate against anyone who he perceives has done him wrong." "[Because] Shankar [Musunuri] knew that Vu had alerted the Board, he shut down and cut us off."

75.    CW-1 stated that after Vu's termination in August 2023, senior executives approached others in the finance department demanding they sign the Q2 2023 10-Q.  Andrew Walsh, VP of Finance, was asked to sign but refused to do so.  Walsh was also fired a few weeks later.  After Walsh, the senior executives approached a second person who CW-1 declined to identify.  According to CW-1, she too refused to sign.

76.    CW-3 worked at Ocugen from September 2021 to November 2023 as Accounting Manager (from September 2021 to April 2022) and Associate Director of Accounting (from April 2022 to November 2023).  CW-3 worked at the Company headquarters in Malvern, Pennsylvania, and from September 2021 through March 2022, reported to Sanjay Subramanian, the CFO; from

March 2022 through March 2023, reported to Jessica Crespo, Chief Accounting Officer and Vice President of Finance; and from March 2023 through October 2023, reported to Andrew Walsh, Senior Director of Finance and Treasury.[4]

77.    CW-3 confirms that in August 2023, after Vu left the Company, Walsh was asked to sign the Q2 2023 10-Q but refused to do so.

78.    CW-3 also stated that in August 2023, the second person approached to sign was Jaiby Abraham, who was then Manager, Financial Reporting. The appeal to sign the Q2 2023 10-Q came from Shankar Musunuri.  Musunuri met with Abraham in her office in mid-to-late August 2023.  When his initial request to her to sign failed, Musunuri appealed to her again based on their shared Indian heritage, CW-3 stated.  Based on that shared heritage, Musunuri stated we have to help each other succeed, according to CW-3.  But Abraham still refused to sign the Q2 2023 10-Q.

79.    ***At the time of his requests to Abraham to sign the Q2 2023 10-Q, Musunuri knew about the misrepresentations in the Company's Q2 2023 10-Q because of his earlier discussions with Vu.***

80.    Because of the refusals to sign the Q2 2023 10-Q, Ocugen was unable to file its quarterly report for the quarter ended June 30, 2023 with the SEC by the deadline. On August 15, 2023, after the market closed, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC. The filing states the "Company requires additional time primarily as a result of recent transition in the Company's management, including its principal financial officer and principal accounting officer [Vu]. Despite working diligently in an effort to timely file the Form 10-Q, the Company has been unable to complete all work necessary to timely file the Form 10-

---

[4] CW-3 is further identified herein at ¶¶ 104-07.

Q."  The filing did not disclose that Vu had refused to sign the Q2 2023 10-Q due to fraud, that he was subsequently terminated, and that at least two other finance executives refused to sign as well.

81.     On August 21, 2023, the Company filed its Q2 2023 10-Q which was signed solely by Musunuri in his capacity as Chairman, CEO, & Co-founder and "Principal Executive Officer and *Interim Principal Financial Officer*." (Emphasis added.)

### 3.    All or Most of the Finance Division Professional Staff Either Quit or Were Fired in the Fall of 2023

82.     CW-1 stated that by August 2023, he and his colleagues recognized that the Company was likely preparing for a complete shakeup of the finance division given that top executives could find no one there to sign the Q2 2023 10-Q.  "Our impression was that they didn't want a finance department that exercised independent thought." "We knew it was only a matter of time before they fired everyone and brought in consultants who would do what they were told and act as stenographers. Everyone was looking for work."  According to CW-3, there were 11 or 12 people in the finance division in January 2023.  Between September and December 2023, all or most of the professional staff in the finance division were fired or resigned, as per CW-1.[5]

### D.    THE CANSINOBIO COLLABORATIVE AGREEMENT

83.     Ocugen entered into a co-development and commercialization agreement with CanSinoBIO with respect to the development and commercialization of the Company's modifier gene therapy product candidates for retinal diseases – OCU400, OCU410, and OCU410ST.  The co-development and commercialization agreement was originally entered into in September 2019 with regards to OCU400 and was subsequently amended in September 2021 and November 2022 to include OCU410 and OCU410ST, respectively.  These product candidates were key products for the Company and part of its core operations.

---

[5] The Company's finance division included the Company's accountants.

84.    The agreement provides that CanSinoBIO is responsible for the chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products and is responsible for the costs associated with such activities.

85.    The agreement further provides that CanSinoBIO has an exclusive license to develop, manufacture, and commercialize the Company's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory"), and the Company maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside the CanSinoBIO Territory (the "Company Territory").

86.    Dating back to the beginning of the Class Period, Ocugen failed to properly account for its collaborative arrangement with CanSinoBIO to inflate the Company's financials.

### E.    REVENUE RECOGNITION AND ACCOUNTING FOR COLLABORATIVE ARRANGEMENTS

#### 1.    Revenue Recognition

87.    In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* (Accounting Standards Codification "ASC" Topic 606).  This new standard replaced all previous accounting guidance on this topic and eliminated all industry-specific guidance.  The revenue recognition standard became effective in 2018 but Histogenics Corporation (Ocugen's predecessor) adopted the standard early in Q4 2017.[6]

88.    The new revenue recognition guidance provides a unified model to determine how revenue is recognized. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the

---

[6] 2018 10-K.

consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606-10-05-3. An entity is required to recognize revenue in accordance with the following five steps:

    a.  Step 1: Identify the contract(s) with a customer….

    b.  Step 2: Identify the performance obligations in the contract….

    c.  Step 3: Determine the transaction price—The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash. The transaction price also is adjusted for the effects of the time value of money if the contract includes a significant financing component and for any consideration payable to the customer. ***If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.*** (See paragraphs 606-10-32-2 through 32-27.

    d.  Step 4: Allocate the transaction price to the performance obligations in the contract….

    e.  Step 5: ***Recognize revenue when (or as) the entity satisfies a performance obligation***—An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (***which is when the customer obtains control of that good or service***). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). ***For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's progress toward complete satisfaction of that performance obligation.*** (See paragraphs 606-10-25-23 through 25-30.) ASC 606-10-05-4.

Emphasis added.

89.     With respect to performance obligations satisfied over time, ASC 606 requires companies to "recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. The objective when measuring progress is to depict an entity's performance in transferring control of goods or services promised to a customer (that is, the satisfaction of an entity's performance obligation)." ASC 606-10-25-31. "An entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall remeasure its progress toward complete satisfaction of a performance obligation satisfied over time." ASC 606-10-25-32.

90.     "Appropriate methods of measuring progress include output methods and input methods." ASC 606-10-25-33.  "Input methods recognize revenue on the basis of the entity's efforts or inputs to the satisfaction of a performance obligation (for example, resources consumed, labor hours expended, costs incurred, time elapsed, or machine hours used) relative to the total expected inputs to the satisfaction of that performance obligation. If the entity's efforts or inputs are expended evenly throughout the performance period, it may be appropriate for the entity to recognize revenue on a straight-line basis." ASC 606-10-55-20.

91.     ASC 606 requires the following disclosures, among others:

    a.  Revenue recognized from contracts with customers, to be disclosed separately from other sources of revenue. ASC 606-10-50-4.

    b.  Recognized revenue from contracts with customers to be disaggregated into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors. ASC 606-10-50-5.

     c.   The opening and closing balances of receivables, contract assets, and contract liabilities from contracts with customers.[7] ASC 606-10-50-8a.

92.    As discussed below, Ocugen acknowledged that it should have accounted for revenues earned from its collaborative arrangements by analogizing to ASC 606 and used the input method to measure satisfaction of its performance obligation.

### 2.    Accounting for Collaborative Arrangements

93.    A collaborative arrangement is a contractual arrangement under which two or more parties actively participate in a joint operating activity (*e.g.*, joint development and commercialization of intellectual property or a drug candidate) and are exposed to significant risks and rewards that depend on the activity's commercial success. ASC 808-10-20, ASC 808-10-15-7. ASC 808, *Collaborative Arrangements*, provides guidance for the presentation and disclosure of transactions in collaborative arrangements. ASC 808-10-05-1.

94.    ASC 808 requires the following disclosures for collaborative arrangements:

In the period in which a collaborative arrangement is entered into … and all annual periods thereafter, a participant to a collaborative arrangement shall disclose all of the following:

a.    Information about the nature and purpose of its collaborative arrangements
b.    Its rights and obligations under the collaborative arrangements
c.    The accounting policy for collaborative arrangements in accordance with Topic 235
d.    The income statement classification and amounts attributable to transactions arising from the collaborative arrangement between participants for each period an income statement is presented.

Information related to individually significant collaborative arrangements shall be disclosed separately. ASC 808-10-50-1.

---

[7] A "contract asset" is "an entity's right to consideration in exchange for goods or services that the entity has transferred to a customer when that right is conditioned on something other than the passage of time (for example, the entity's future performance)." A "contract liability" is "an entity's obligation to transfer goods or services to a customer for which the entity has received consideration (or the amount is due) from the customer." ASC 606-10-20.

95.     Prior to 2020, ASC 808 did not provide comprehensive recognition or measurement guidance for collaborative arrangements, and the accounting for those arrangements was often based on an analogy to other accounting literature or an accounting policy election, which resulted in diversity in practice. ASU 2018-18, ASC 808-10-15-5 (prior to being amended by ASU 2018-18).

96.     In November 2018, FASB issued updated guidance to specify when transactions between collaborative arrangement participants should be accounted for in accordance with revenue recognition guidance contained in ASC 606, *Revenue from Contracts with Customers*, which became effective for public companies during 2018. ASU 2018-18.  The new guidance for collaborative arrangements became effective for calendar 2020.

97.     Pursuant to the new guidance, transactions between collaborative arrangement participants are within the scope of ASC 606 when the collaborative arrangement participant is a customer in the context of a <u>unit of account</u> (*i.e.*, distinct good or service).  In those situations, all guidance in ASC 606 should be applied, including recognition, measurement, presentation, and disclosure requirements. ASC 808-10-15-5B.

98.     For collaborative arrangements that are wholly or partially outside the scope of other accounting standards, including topic 606, *Revenue from Contracts with Customers*, the accounting and financial statement presentation for those parts of the agreement which are outside the scope of other authoritative accounting literature are required to be based on an analogy to authoritative accounting literature or, if there is no appropriate analogy, a reasonable, rational, and consistently applied accounting policy election. ASC 808-10-15-5C; ASC 808-10-45-3.

99.     The new guidance also precluded entities from presenting consideration from transactions with a collaborator that is not a customer together with revenue recognized from

contracts with customers. ASC 808-10-45-3. In other words, revenue from collaborative arrangements could not be presented together with regular revenue. However, revenue from collaborative arrangements could still be presented separately from revenue from contracts with customers (*e.g.*, as "collaboration revenue") on the income statement.

100.    Ocugen adopted the FASB update effective January 1, 2020 (emphasis added):

> In November 2018, the FASB issued ASU No. 2018-18, *Collaborative Arrangements (Topic 808): Clarifying the Interaction between Topic 808 and Topic 606*. This standard clarifies that certain transactions between collaborative arrangement participants should be accounted for as revenue under ASC 606 when the collaborative arrangement participant is a customer in the context of a unit of account. In those situations, ASC 606 guidance should be applied, including recognition, measurement, presentation, and disclosure requirements. The standard adds unit-of-account guidance to ASC 808 to align with the guidance in ASC 606 when an entity is assessing whether the collaborative arrangement or a part of the collaborative arrangement is within the scope of ASC 606. The standard also precludes a company from presenting transactions with collaborative arrangement participants that are not directly related to sales to third parties with revenue from contracts with customers recognized under ASC 606 if the collaborative arrangement participant is not a customer. ***This standard was effective for the Company on January 1, 2020***. Consistent with the guidance in this standard, the Company assesses whether collaboration arrangements are within the scope of ASC 606. For collaboration arrangements that are not within the scope of ASC 606, applicable transactions with collaborative arrangement participants are presented as collaboration revenue rather than revenue from contracts with customers. See above and Note 4 for additional information.[8]

2020 10-K.

101.    Ocugen was required to evaluate its CanSinoBIO agreement at inception and throughout the life of the arrangement to determine whether it was a collaborative arrangement within the scope of ASC 808. ASC 808-10-15-6. Although the CanSinoBIO agreement is clearly a collaborative arrangement within the scope of ASC 808, Ocugen failed to recognize it as a collaborative arrangement from 2019 through 2021 or for most of the Class Period. Moreover, even after acknowledging in its 2022 Form 10-K that the CanSinoBIO agreement was, indeed, a

---

[8] 2020 10-K, at F-13.

collaborative arrangement, Ocugen failed to follow the guidance in ASC 808 and continued to incorrectly account for the CanSinoBIO agreement. Ocugen failed to follow ASC 808 and account for the CanSinoBIO arrangement by analogy to an appropriate authoritative accounting standard. In the restatement, Ocugen acknowledged that such appropriate accounting standard was ASC 606, *Revenue from Contracts with Customers*.

102.    As acknowledged in the restatement, Ocugen's failed to analogize it's accounting for CanSinoBIO arrangement to ASC 606 and as a result failed to correctly apply the relevant accounting and disclosure provisions of ASC 606.  Specifically, Ocugen acknowledged that it "had not appropriately accounted for its collaboration arrangements, including the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received and recognized as research and development expense."  The Company also failed to separately present the revenue it recognized from the CanSinoBIO agreement and had instead netted such revenue within "Other income (expense), net" line item on the income statement.

103.    As demonstrated below, through its improper application of ASC 808 and ASC 606, Ocugen was able to significantly understate its current liabilities and accumulated deficit, overstate its stockholders' equity, and inflate its current ratio.  Moreover, this improper application of the accounting standards enabled Ocugen to understate its R&D expense, losses from operations, net losses, and losses per share.

F.    **THE CANSINOBIO AGREEMENT "WAS A BLACK HOLE FOR ACCOUNTING AND FINANCE"**

104.    CW-3 worked at Ocugen from September 2021 to November 2023 as Accounting Manager (from September 2021 to April 2022) and Associate Director of Accounting (from April 2022 to November 2023).  Accounting was part of the finance division.

105.    CW-3 worked at the Company's headquarters in Malvern, Pennsylvania, and from September 2021 through March 2022, reported to CFO Subramanian; from March 2022 through March 2023, reported to Crespo, Chief Accounting Officer and Vice President of Finance; and from March 2023 through October 2023, reported to Andrew Walsh, Senior Director of Finance and Treasury.

106.    CW-3 handled day-to-day accounting functions in both of his positions at the Company.  His responsibility included reviewing financial information provided by the various divisions within the Company, contractors and vendors.

107.    CW-3 did the accounting for the CanSinoBIO agreement.  CW-3 stated that "[e]veryone in the department touched it at one point or another but no one else [apart from himself] really dug deeply into it."  According to CW-3, it was more of a math role than a more detailed accounting effort, relying on estimates from the science division.

108.    CW-3 stated that the CanSinoBIO relationship was the largest contractual relationship with an outside company.  The contract contained a set value regarding what work was being completed to come up with an estimate of deferred expenses and revenue.

### 1.    There Was a Significant Internal Control Deficiency as a Result of the Accountants' Limited Access to Anything Related to the CanSinoBIO Agreement

109.    Accounting had very limited access to anything related to the CanSinoBIO agreement.  CW-3 stated that CW-3 and other *Company accountants were allowed to contact every company in a business relationship with Ocugen except CanSinoBIO and it was CW-3's understanding that that had been the rule since the agreement was signed*.  According to CW-3, Arun Upadhyay, Chief Scientific Officer, made clear that *the rule came down from the top*. As a result, the accountants had little information about CanSinoBIO when preparing financial results

for public disclosure. CW-3 stated that the lack of contact with CanSinoBIO "made it hard when we were doing financials and were not allowed to reach out to guide the work."

110.    The financial numbers provided to accounting with respect to the CanSinoBIO agreement were estimates made by Upadhyay based on *his* assessments of the amount of work completed under the agreement and estimated costs.  That meant CW-3 *depended totally on the estimates from the science department* based on its representation of the value of the contract and its estimates of the total amount of work completed.  According to CW-3, then it was just math. Those numbers were then used to determine the publicly reported deferred expenses and revenue. CW-3 did not hear and saw no evidence of the estimates for the CanSinoBIO agreement being subjected to internal and disclosure controls.  Whenever the team had questions regarding the underlying facts regarding CanSinoBIO that were the basis for Ocugen's financial estimates, they were forced to ask Musunuri, Upadhyay, or Michael Shine, head of the Commercial Division. According to CW-3, *the CanSinoBIO agreement "was a black hole for accounting and finance."*

### G.    The April 1, 2024 Restatement Announcement

111.    On April 1, 2024, Ocugen announced in a Form 8-K filed with the SEC that its *Q1 2020 through Q3 2023 financial statements*, as well as the associated earnings releases and investor presentations or other communications describing such financial statements, *were materially misstated and should no longer be relied upon* due to identified errors relating to the Company's accounting for the estimated costs in a collaboration arrangement.

112.    The April 1, 2024 Form 8-K further disclosed that the identified errors *would result in a restatement* related to certain agreements with one of the Company's business partners related

to a collaboration agreement but did not disclose which collaboration agreement was not accounted for correctly.  The collaboration agreement at issue was the CanSinoBIO agreement.[9]

113.    The April 1, 2024 Form 8-K further disclosed that the Company would restate its consolidated financial statements as of and for the year ended December 31, 2022, in connection with the filing of its 2023 Form 10-K, as well as the Company's unaudited financial information for each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K.

114.    The April 1, 2024 Form 8-K also disclosed *that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the periods to be restated and that its internal control over financial reporting was not effective as of December 31, 2023.*  As a result, *the Company concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.*

115.    The April 1, 2024 disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession a "Big R restatement."  A Big R restatement occurs when the error is *material* to the prior period financial statements.  When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

**Materially False and Misleading Statements
Issued During the Class Period**

**Statements Regarding First Quarter 2020**

116.    The Class Period begins on May 8, 2020, when Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2020 (the "Q1 2020 10-Q") signed

---

[9] The 2023 10-K also did not disclose the identity of the counterparty to the collaboration agreement that was incorrectly accounted for in the Company's previously issued financial statements but it revised its "License and Development Agreements" disclosure to only include one agreement (containing several amendments) with CanSinoBIO, which Ocugen identified as the only one within the scope of ASC 808.

by Defendant Musunuri and Subramanian. The Q1 2020 10-Q contained purported financial results

of the Company, recording, *inter alia*, (i) total current liabilities of $3,314,998, accumulated deficit

of $55,423,643, and total stockholder's equity of $7,297,105 in the Company's unaudited

Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0,[10] R&D expenses of

$1,652,318, loss from operations of $3,929,102, other income (expense), net[11] of ($14,717), net

loss of $3,943,819, and loss per share of $0.07 in the Company's unaudited Income Statement.

117.    The Q1 2020 10-Q contained the following statements regarding the Company's

disclosure controls (emphasis added):

> We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) (the "Exchange Act"), as of March 31, 2020. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure….

118.    Attached to the Q1 2020 10-Q were certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX") signed by Defendant Musunuri and Subramanian attesting to the accuracy of

financial reporting, the disclosure of all significant deficiencies and material weaknesses in the

---

[10] The "collaborative revenue" line item did not appear on the Company's Income Statements except for in the Q2 2020 10-Q (defined below), Q3 2020 10-Q (defined below), and the 2020 10-K (defined below).

[11] With respect to the Company's Income Statements, the terms "Other income (expense), net" and "Total other income (expense)" are interchangeable.

design or operation of internal control over financial reporting, and the disclosure of all fraud.  The

certification states (emphasis added):

1.    I have reviewed this Quarterly Report on Form 10-Q of Ocugen, Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.    ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably

likely to materially affect, the registrant's internal control over financial reporting; and

5.    ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

    a.    ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b.    ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

119.    On May 8, 2020, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q1 2020 financial results (the "May 8, 2020 Press Release"). The May 8, 2020 Press Release disclosed, *inter alia*, total current liabilities of $3,314,998, accumulated deficit of $55,423,643, and total stockholder's equity of $7,297,105 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,652,318, loss from operations of $3,929,102, other income (expense), net of ($14,717), net loss of $3,943,819, and loss per share of $0.07 in the Company's unaudited Income Statement.

120.    The statements in (or referred to in) ¶¶ 116-19 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding

total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q1 2020 10-Q and May 8, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Second Quarter 2020**

121.    On August 14, 2020, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2020 (the "Q2 2020 10-Q") signed by Defendants Musunuri and Subramanian. The Q2 2020 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $7,041,353, accumulated deficit of $59,037,618, and total stockholder's equity of $14,623,027 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $1,629,869, loss from operations of $3,366,265, other income (expense), net of ($247,710), net loss of $3,613,975, and loss per share of $0.19 in the Company's unaudited Income Statement.

122.    The Q2 2020 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

123.    Attached to the Q2 2020 10-Q were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

124.    On August 14, 2020, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q2 2020 financial results (the

"August 14, 2020 Press Release"). The August 14, 2020 Press Release disclosed, *inter alia*, total current liabilities of $7,041,353, accumulated deficit of $59,037,618, and total stockholder's equity of $14,623,027 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $1,629,869, loss from operations of $3,366,265, other income (expense), net of ($247,710), net loss of $3,613,975, and loss per share of $0.19 in the Company's unaudited Income Statement.

125.    The statements in (or referred to in) ¶¶ 121-24 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q2 2020 10-Q and August 14, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Third Quarter 2020**

126.    On November 6, 2020, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2020 (the "Q3 2020 10-Q") signed by Defendant Musunuri and Subramanian. The 3Q 2020 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $4,130,787, accumulated deficit of $69,511,465, and total stockholder's equity of $14,421,645 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,477,382, loss from operations of $10,181,980, other income (expense), net of ($291,867), net loss of $10,473,847, and loss per share of $0.07 in the Company's unaudited Income Statement.

127.    The Q3 2020 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

128.    Attached to the Q3 2020 10-Q were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

129.    On November 6, 2020, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q3 2020 financial results (the "November 6, 2020 Press Release"). The November 6, 2020 Press Release disclosed, *inter alia*, total current liabilities of $4,130,787, accumulated deficit of $69,511,465, and total stockholder's equity of $14,421,645 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,477,382, loss from operations of $10,181,980, other income (expense), net of ($291,867), net loss of $10,473,847, and loss per share of $0.07 in the Company's unaudited Income Statement.

130.    The statements in (or referred to in) ¶¶ 126-29 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material

adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q3 2020 10-Q and the November 6, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Year Ended December 31, 2020**

131.    On March 19, 2021, Ocugen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended December 31, 2020 ("2020 10-K"), signed by Defendant Musunuri and Subramanian. The 2020 10-K contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $3,613,551, accumulated deficit of $73,301,777, and total stockholder's equity of $21,550,441 in the Company's Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $6,353,287, loss from operations of $21,284,717, other income (expense), net of ($537,236), net loss of $21,821,953, and loss per share of $0.31 in the Company's audited Income Statement.

36

132.    The 2020 10-K contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

133.    The 2020 10-K stated:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, our principal executive officer and principal financial officer and effected by our Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in conformity with GAAP….

Under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework of 2013. Based on this assessment, *management concluded that our internal control over financial reporting was effective as of December 31, 2020*.

134.    Attached to the 2020 10-K were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

135.    On March 18, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding full year 2020 financial results (the "March 18, 2021 Press Release").  The March 18, 2021 Press Release disclosed, *inter alia*, total current liabilities of $3,613,551, accumulated deficit of $73,301,777, and total stockholder's equity of $21,550,441 in the Company's unaudited Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $6,353,287, loss from operations of $21,284,717, other income (expense), net of ($537,236), net loss of $21,821,953, and loss per share of $0.31 in the Company's unaudited Income Statement.

136.    The statements in (or referred to in) ¶¶ 131-35 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material

adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's Income Statement set forth in the Company's 2020 10-K and March 18, 2021 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

137.    The 2020 10-K also states (emphasis added):

***Collaboration Arrangements***

The Company assesses whether collaboration agreements are subject to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether they involve joint operating activities and whether both parties have active participation in the arrangement and are exposed to significant risks and rewards. To the extent that the arrangement falls within the scope of ASC 808, the Company assesses whether the payments between the Company and the collaboration partner are subject to other accounting literature. If payments from the collaboration partner represent consideration from a customer, the Company accounts for those payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). However, if the Company concludes that its collaboration partner is not a customer, the Company will record royalty payments received as collaboration revenue in the period in which the underlying sale occurs and record expenses and expense reimbursements as either research and development expense or general and administrative expense, or a reduction thereof, based on the underlying nature of the expense or expense reimbursement.

***The Company has two agreements accounted for as collaborative agreements within the scope of ASC 808.*** See Note 4 for additional information.

138.    Note 4 explains that the two collaborative agreements accounted for as collaborative agreements within the scope of ASC 808 were with Advaite, Inc., a company co-founded and managed by Musunuri's son, and The Shepens Eye Research Institute.  Ocugen failed to account for its agreement with CanSinoBIO as a collaborative agreement.

4.  License and Development Agreements

***Collaboration Agreement with Advaite, Inc.***

In April 2020, the Company entered into a collaboration agreement (the "Advaite Agreement") with Advaite, Inc. ("Advaite") with respect to the development of Advaite's RapCov COVID-19 Testing Kit (the "COVID-19 Test"). Advaite was co-founded and is being managed by Mr. Karthik Musunuri, the son of the Company's Chief Executive Officer, Chairman of the Board and co-founder, Dr. Shankar Musunuri. Pursuant to the Advaite Agreement, the Company has provided, and will continue to provide as required in the future, certain production, research and development, technical, regulatory, and quality support services to Advaite in connection with the development and commercialization of the COVID-19 Test (the "Ocugen Services"). Advaite is responsible for the research, development, and seeking to obtain regulatory approval of the COVID-19 Test, and where regulatory approval is obtained, commercialize the COVID-19 Test. In January 2021, the COVID-19 Test received EUA from the FDA.

\*\*\*

The Advaite Agreement is a collaborative arrangement within the scope of ASC 808. Cost reimbursements are recorded as a reduction in research and development expense in the period incurred. Royalty payments are recorded as collaboration revenue in the period in which the underlying sale occurs. For the year ended December 31, 2020, the Company recorded $0.3 million as a reduction of research and development expense. For the year ended December 31, 2020, the Company recorded $42,620 as collaboration revenue in connection with the Advaite Agreement.

\*\*\*

***Co-Development and Commercialization Agreement with CanSino Biologics Inc.***

In September 2019, Ocugen entered into a co-development and commercialization agreement (the "CanSinoBIO Agreement") with CanSino Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of the gene therapy product candidate, OCU400.

***CanSinoBIO will be responsible for all the costs for chemistry, manufacturing and control development and manufacture of clinical supplies of OCU400 for all*** territories. ***CanSinoBIO will be solely responsible for all costs and expenses of its development activities in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory") and Ocugen will be responsible for all costs and expenses of its development activities for any global location outside the CanSinoBIO Territory (the "Ocugen OCU400 Territory"). CanSinoBIO will pay to Ocugen an annual royalty between mid-to-high single digits based on net sales of products in the CanSinoBIO Territory, and Ocugen will pay to CanSinoBIO an annual royalty between low-to-mid single digits based on net sales of products in the Ocugen OCU400 Territory.***

\*\*\*

### License Agreement with The Schepens Eye Research Institute

In December 2017, the Company entered into an exclusive license agreement with SERI, which was amended in January 2021 (as so amended the "SERI Agreement"). The SERI Agreement gives the Company an exclusive, worldwide, sublicensable license to patent rights, biological materials and technical information for nuclear hormone receptor genes Nuclear Receptor Subfamily 1 Group D Member 1, *NR2E3* (OCU400), *RORA* (OCU410), Nuclear Protein 1, Transcriptional Regulator, and Nuclear Receptor Subfamily 2 Group C Member 1….

\*\*\*

The SERI Agreement is a collaborative arrangement within the scope of ASC 808. Payments pursuant to the SERI Agreement are recorded as research and development expense in the period the obligation is incurred. The SERI Agreement requires the Company to pay licensing fees for patent rights granted, an annual license maintenance fee of $25,000 the first two calendar years following the expiration or termination of the Sponsored Research Agreement and an annual license maintenance fee of $0.1 million for each calendar year thereafter, payment of up to $6.0 million upon the achievement of certain development and regulatory milestones, payment of up to $10.1 million upon the achievement of certain commercial milestones, and royalties in the low-single digits based on net sales. The Company has made no milestone or royalty payments to date pursuant to the SERI Agreement.

Emphasis added.

139.    The statements in (or referred to in) ¶¶ 137-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements in its financial statements (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding First Quarter 2021**

140.    On May 7, 2021, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2021 (the "Q1 2021 10-Q") signed by Defendant Musunuri and Subramanian. The Q1 2021 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $4,281,000, accumulated deficit of $80,379,000, and total stockholder's equity of $46,489,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $2,872,000, loss from operations of $7,057,000, other income (expense), net of ($20,000), net loss of $7,077,000, and loss per share of $0.04 in the Company's unaudited Income Statement.

141.    The Q1 2021 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

142.    Attached to the Q1 2021 10-Q were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

143.    On May 7, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q1 2021 financial results (the "May 7, 2021 Press Release"). The May 7, 2021 Press Release disclosed, *inter alia*, total current liabilities of $4,281,000, accumulated deficit of $80,379,000, and total stockholder's equity of $46,489,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $2,872,000, loss from operations of $7,057,000, other income (expense), net of ($20,000), net loss of $7,077,000, and loss per share of $0.04 in the Company's unaudited Income Statement.

144.    The statements in (or referred to in) ¶¶ 140-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q1 2021 10-Q and May 7, 2021 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one

42

or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Second Quarter 2021**

145.    On August 6, 2021, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2021 (the "Q2 2021 10-Q") signed by Defendant Musunuri and Subramanian. The Q2 2021 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $4,840,000, accumulated deficit of $106,331,000, and total stockholder's equity of $116,409,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $18,853,000, loss from operations of $25,610,000, other income (expense), net of ($342,000), net loss of $25,952,000, and loss per share of $0.13 in the Company's unaudited Income Statement.

146.    The Q2 2021 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

147.    Attached to the Q2 2021 10-Q were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

148.    On August 6, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q2 2021 financial results (the "August 6, 2021 Press Release"). The August 6, 2021 Press Release disclosed, *inter alia*, total current liabilities of $4,840,000, accumulated deficit of $106,331,000, and total stockholder's equity of $116,409,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $18,853,000, loss from operations of $25,610,000, other income (expense), net of ($342,000), net loss of $25,952,000, and loss per share of $0.13 in the Company's unaudited Income Statement.

149.    The statements in (or referred to in) ¶¶ 145-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q2 2021 10-Q and August 6, 2021 Press Release (and would later admit that the financial statements therein were materially misstated should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Third Quarter 2021**

150.    On November 9, 2021, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2021 (the "Q3 2021 10-Q") signed by Defendant Musunuri and Subramanian. The Q3 2021 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $6,229,000, accumulated deficit of $117,086,000, and total stockholder's equity of $107,110,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $6,281,000, loss from operations of $10,789,000, other income (expense), net of ($18,000), net loss of

$10,755,000, and loss per share of $0.05 in the Company's unaudited Income Statement.

151.    The Q3 2021 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

152.    Attached to the Q3 2021 10-Q were SOX certifications signed by Defendant Musunuri and Subramanian as described in ¶ 118.

153.    On November 9, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q3 2021 financial results (the "November 9, 2021 Press Release").  The November 9, 2021 Press Release disclosed, *inter alia*, total current liabilities of $6,229,000, accumulated deficit of $117,086,000, and total stockholder's equity of $107,110,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $6,281,000, loss from operations of $10,789,000, other income (expense), net of ($18,000), net loss of $10,755,000, and loss per share of $0.05 in the Company's unaudited Income Statement.

154.    The statements in (or referred to in) ¶¶ 150-53 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's

unaudited Income Statement set forth in the Company's Q3 2021 10-Q and November 9, 2021

Press Release (and would later admit that the financial statements therein were materially misstated

and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate

one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed,

was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Year Ended December 31, 2021**

155.    On February 28, 2022, Ocugen filed an annual report on Form 10-K with the SEC,

reporting the Company's financial and operational results for the fiscal year ended December 31,

2021 ("2021 10-K"), signed by Defendant Musunuri and Subramanian. The 2021 10-K contained

purported financial results of the Company, recording, *inter alia*, total current liabilities of

$7,000,000, accumulated deficit of $131,667,000, and total stockholder's equity of $95,818,000 in

the Company's Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses

of $35,108,000, loss from operations of $58,028,000, other income (expense), net of ($389,000),

net loss of $58,365,000, and loss per share of $0.30 in the Company's audited Income Statement.

156.    The 2021 10-K contained nearly identical statements regarding the Company's

disclosure controls as set forth in ¶ 117.

157.    The 2021 10-K also stated: Under the supervision of and with the participation of

our Chief Executive Officer and Chief Financial Officer, our management assessed the

effectiveness of our internal control over financial reporting as of December 31, 2021 … and

[b]ased on this assessment, management concluded that our internal control over financial

reporting was effective as of December 31, 2021.

158.    Attached to the 2021 10-K were SOX certifications signed by Defendant Musunuri

and Subramanian as described in ¶ 118.

159.    On February 25, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding full year 2021 financial results (the "February 25, 2022 Press Release").  The February 25, 2022 Press Release disclosed, *inter alia*, total current liabilities of $7,000,000, accumulated deficit of $131,667,000, and total stockholder's equity of $95,818,000 in the Company's unaudited Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $35,108,000, loss from operations of $58,028,000, other income (expense), net of ($389,000), net loss of $58,365,000, and loss per share of $0.30 in the Company's unaudited Income Statement.

160.    The statements in (or referred to in) ¶¶ 155-59 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's Income Statement set forth in the Company's 2021 10-K and February 25, 2022 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

161.    The accounting policy disclosure for collaborative arrangements in the 2021 10-K was identical to the 2020 10-K.  Ocugen disclosed that it did not record any revenue from collaborative arrangements during 2021.  The 2021 10-K states (emphasis added):

> **Collaboration Arrangements**
>
> The Company assesses whether collaboration agreements are subject to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether they involve joint operating activities and whether both parties have active participation in the arrangement and are exposed to significant risks and rewards. To the extent that the arrangement falls within the scope of ASC 808, the Company assesses whether the payments between the Company and the collaboration partner are subject to other accounting literature. If payments from the collaboration partner represent consideration from a customer, the Company accounts for those payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with Customers*. However, if the Company concludes that its collaboration partner is not a customer, the Company will record royalty payments received as collaboration revenue in the period in which the underlying sale occurs and record expenses and expense reimbursements as either research and development expense or general and administrative expense, or a reduction thereof, based on the underlying nature of the expense or expense reimbursement. ***During the year ended December 31, 2020, the Company recorded collaboration revenue from an agreement accounted for as a collaborative arrangement within the scope of ASC 808. No collaboration revenue was recorded during the years ended December 31, 2021*** and 2019.

162.    The 2021 10-K states that the Company entered into a new Co-Development, Supply and Commercialization Agreement with Bharat Biotech, which was also accounted for as a collaboration arrangement within the scope of ASC 808.  The Company's disclosures regarding the CanSinoBIO arrangements were substantially identical to the 2020 10-K, as set forth in ¶ 138.

163.    The statements in (or referred to in) ¶¶ 161-62 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial

reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed

to properly account for its CanSinoBIO arrangement resulting in material misstatements in its

financial statements (and would later admit that the financial statements therein were materially

misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced

to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing,

once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding First Quarter 2022**

164.    On May 6, 2022, Ocugen filed with the SEC its quarterly report on Form 10-Q for

the period ending March 31, 2022 (the "Q1 2022 10-Q") signed by Defendant Musunuri and

Crespo. The Q1 2022 10-Q contained purported financial results of the Company, recording, *inter*

*alia*, total current liabilities of $7,687,000, accumulated deficit of $149,686,000, and total

stockholder's equity of $131,129,000 in the Company's unaudited Condensed Consolidated

Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $7,915,000, loss from

operations of $18,034,000, other income (expense), net of $15,000, net loss of $18,019,000, and

loss per share of $0.09 in the Company's unaudited Income Statement.

165.    The Q1 2022 10-Q contained nearly identical statements regarding the Company's

disclosure controls as set forth in ¶ 117.

166.    Attached to the Q1 2022 10-Q were SOX certifications signed by Defendant

Musunuri and Crespo as described in ¶ 118.

167.    On May 6, 2022, Ocugen also filed with the SEC a current report on Form 8-K

signed by Musunuri with an attached press release regarding Q1 2022 financial results (the "May

6, 2022 Press Release").  The May 6, 2022 Press Release disclosed, *inter alia*, total current

liabilities of $7,687,000, accumulated deficit of $149,686,000, and total stockholder's equity of

$131,129,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $7,915,000, loss from operations of $18,034,000, other income (expense), net of $15,000, net loss of $18,019,000, and loss per share of $0.09 in the Company's unaudited Income Statement.

168.    The statements in (or referred to in) ¶¶ 164-67 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q1 2022 10-Q and May 6, 2022 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Second Quarter 2022**

169.    On August 5, 2022, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2022 (the "Q2 2022 10-Q") signed by Defendant Musunuri and Crespo. The Q2 2022 10-Q contained purported financial results of the Company, recording, *inter*

*alia*, total current liabilities of $10,338,000, accumulated deficit of $169,157,000, and total stockholder's equity of $114,108,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $9,007,000, loss from operations of $19,565,000, other income (expense), net of $94,000, net loss of $19,471,000, and loss per share of $0.09 in the Company's unaudited Income Statement.

170.    The Q2 2022 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

171.    Attached to the Q2 2022 10-Q were SOX certifications signed by Defendant Musunuri and Crespo as described in ¶ 118.

172.    On August 5, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q2 2022 financial results (the "August 5, 2022 Press Release").  The August 5, 2022 Press Release disclosed, *inter alia*, total current liabilities of $10,338,000, accumulated deficit of $169,157,000, and total stockholder's equity of $114,108,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $9,007,000, loss from operations of $19,565,000, other income (expense), net of $94,000, net loss of $19,471,000, and loss per share of $0.09 in the Company's unaudited Income Statement.

173.    The statements in (or referred to in) ¶¶ 169-72 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed

to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q2 2022 10-Q and August 5, 2022 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Third Quarter 2022**

174.    On November 8, 2022, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2022 (the "Q3 2022 10-Q") signed by Defendant Musunuri and Crespo. The Q3 2022 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $14,907,000, accumulated deficit of $191,079,000, and total stockholder's equity of $95,303,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $15,622,000, loss from operations of $23,119,000, other income (expense), net of $1,197,000, net loss of $21,922,000, and loss per share of $0.10 in the Company's unaudited Income Statement.

175.    The Q3 2022 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

176.    Attached to the Q3 2022 10-Q were SOX certifications signed by Defendant Musunuri and Crespo as described in ¶ 118.

177.    On November 8, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q3 2022 financial results (the "November 8, 2022 Press Release").  The November 8, 2022 Press Release disclosed, *inter alia*, total current liabilities of $14,907,000, accumulated deficit of $191,079,000, and total stockholder's equity of $95,303,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration of $0, R&D expenses of $15,622,000, loss from operations of $23,119,000, other income (expense), net of $1,197,000, net loss of $21,922,000, and loss per share of $0.10 in the Company's unaudited Income Statement.

178.    The statements in (or referred to in) ¶¶ 174-77 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q3 2022 10-Q and November 8, 2022 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Year Ended December 31, 2022**

179.    On February 28, 2023, Ocugen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for its fiscal year ended December 31, 2022 ("2022 10-K"), signed by Defendant Musunuri and Crespo. The 2022 10-K states for the first time that it accounted for the CanSinoBIO agreement as a collaborative agreement within the scope of ASC 808.

180.    The 2022 10-K contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $18,460,000, accumulated deficit of $213,018,000, and total stockholder's equity of $84,052,000 in the Company's Consolidated Balance Sheets; and (ii) collaboration of $0, R&D expenses of $49,757,000, loss from operations of $84,868,000, other income (expense), net of $3,517,000, net loss of $81,351,000, and loss per share of $0.38 in the Company's audited Income Statement.

181.    The 2022 10-K contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

182.    The 2022 10-K also stated: Under the supervision of and with the participation of our Chief Executive Officer and Chief Accounting Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022 … and [b]ased on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2022.

183.    Attached to the 2022 10-K were SOX certifications signed by Defendant Musunuri and Crespo as described in ¶ 118.

184.    On February 28, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding full year 2022 financial results (the

"February 28, 2023 Press Release").  The February 28, 2023 Press Release disclosed, inter alia, total current liabilities of $18,460,000, accumulated deficit of $213,018,000, and total stockholder's equity of $84,052,000 in the Company's Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $49,757,000, loss from operations of $84,868,000, other income (expense), net of $3,517,000, net loss of $81,351,000, and loss per share of $0.38 in the Company's unaudited Income Statement.

185.    The statements in (or referred to in) ¶¶ 179-84 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's Income Statement set forth in the Company's 2022 10-K and February 28, 2023 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding First Quarter 2023**

186.    On May 5, 2023, Ocugen filed with the SEC its quarterly report on Form 10-Q for

the period ending March 31, 2023 (the "Q1 2023 10-Q") signed by Defendant Musunuri and Vu. The Q1 2023 10-Q contained purported historical financial results of the Company, recording, *inter alia*, total current liabilities of $15,683,000, accumulated deficit of $229,516,000, and total stockholder's equity of $75,800,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $9,558,000, loss from operations of $17,751,000, other income (expense), net of $1,253,000, net loss of $16,498,000, and loss per share of $0.07 in the Company's unaudited Income Statement.

187.    The Q1 2023 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

188.    Attached to the Q1 2023 10-Q were SOX certifications signed by Defendant Musunuri and Vu as described in ¶ 118.

189.    On May 5, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q1 2023 financial results (the "May 5, 2023 Press Release"). The May 5, 2023 Press Release disclosed, *inter alia*, total current liabilities of $15,683,000, accumulated deficit of $229,516,000, and total stockholder's equity of $75,800,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $9,558,000, loss from operations of $17,751,000, other income (expense), net of $1,253,000, net loss of $16,498,000, and loss per share of $0.07 in the Company's unaudited Income Statement.

190.    The statements in (or referred to in) ¶¶ 186-89 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in

its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q1 2023 10-Q and May 5, 2023 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statements Regarding Second Quarter 2023**

191.    On August 15, 2023, after the market closed, the Company filed a Form 8-K with the SEC signed by Defendant Musunuri stating that CFO Vu is no longer with the Company (emphasis added):

> *Effective August 14, 2023, Quan Vu is no longer serving as the Chief Financial Officer/Chief Business Officer, and as principal financial officer and principal accounting officer, of Ocugen, Inc. The separation from employment is being treated as a severance qualifying event under Mr. Vu's employment agreement.*

192.    On August 15, 2023, the Company's Board appointed Musunuri as the interim principal financial officer, effective immediately, in light of Vu's departure.

193.    On August 15, 2023, after the market closed, the Company also filed a Notification of Late Filing on Form 12b-25 with the SEC with respect to the Q2 2023 10-Q. The filing states the "Company requires additional time primarily as a result of recent transition in the Company's management, including its principal financial officer [Vu] and principal accounting officer.

Despite working diligently in an effort to timely file the Form 10-Q, the Company has been unable to complete all work necessary to timely file the Form 10-Q."

194.    The statements in (or referred to in) ¶¶ 191 and 193 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that Vu had refused to sign the Q2 2023 10-Q due to fraud, that he was subsequently terminated, and that at least two other finance executives refused to sign as well.

195.    On August 21, 2023, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2023 (the "Q2 2023 10-Q") signed by Defendant Musunuri *only*. The Q2 2023 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $13,460,000, accumulated deficit of $252,441,000, and total stockholder's equity of $70,281,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $14,169,000, loss from operations of $23,733,000, other income (expense), net of $808,000, net loss of $22,925,000, and loss per share of $0.10 in the Company's unaudited Income Statement.

196.    The Q2 2023 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

197.    Attached to the Q2 2023 10-Q was a SOX certification signed by Defendant Musunuri only as described in ¶ 118.

198.    On August 21, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q2 2023 financial results (the August 21, 2023 Press Release").  The August 21, 2023 Press Release disclosed, *inter alia*, total current

liabilities of $13,460,000, accumulated deficit of $252,441,000, and total stockholder's equity of $70,281,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $14,169,000, loss from operations of $23,733,000, other income (expense), net of $808,000, net loss of $22,925,000, and loss per share of $0.10 in the Company's unaudited Income Statement.

199.    The statements in (or referred to in) ¶¶ 195-98 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q2 2023 10-Q and August 21, 2023 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**Statement Regarding Third Quarter 2023**

200.    On November 9, 2023, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2023 (the "Q3 2023 10-Q") signed by Defendant Musunuri

and Breininger. The Q3 2023 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $11,136,000, accumulated deficit of $266,603,000, and total stockholder's equity of $58,395,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $6,342,000, loss from operations of $15,424,000, other income (expense), net of $1,262,000, net loss of $14,162,000, and loss per share of $0.06 in the Company's unaudited Income Statement.

201.    The Q3 2023 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 117.

202.    Attached to the Q2 2023 10-Q was a SOX certification signed by Defendant Musunuri and Breininger as described in ¶ 118.

203.    On November 9, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release regarding Q3 2023 financial results (the November 9, 2023 Press Release"). The November 9, 2023 Press Release disclosed, *inter alia*, total current liabilities of $11,136,000, accumulated deficit of $266,603,000, and total stockholder's equity of $58,395,000 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $6,342,000, loss from operations of $15,424,000, other income (expense), net of $1,262,000, net loss of $14,162,000, and loss per share of $0.06 in the Company's unaudited Income Statement.

204.    The statements in (or referred to in) ¶¶ 200-203 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal

control over financial reporting and disclosure controls and procedures were not effective; (ii) as

a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material

misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity

in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue,

R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in

the Company's unaudited Income Statement set forth in the Company's Q3 2023 10-Q and

November 9, 2023 Press Release (and would later admit that the financial statements therein were

materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely

be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the

foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

## THE TRUTH EMERGES

**The August 15, 2023 Announcements**

205.    On August 15, 2023, after the market closed, the Company filed a Form 8-K with

the SEC signed by Defendant Musunuri stating that CFO Vu is no longer with the Company:

> Effective August 14, 2023, Quan Vu is no longer serving as the Chief Financial
> Officer/Chief Business Officer, and as principal financial officer and principal
> accounting officer, of Ocugen, Inc. The separation from employment is being
> treated as a severance qualifying event under Mr. Vu's employment agreement.
>
> On August 15, 2023, the Company's Board of Directors appointed Shankar
> Musunuri, Ph.D., MBA, the Company's Chairman, Chief Executive Officer & Co-
> Founder, as the interim principal financial officer, effective immediately, in light
> of Mr. Vu's departure.[12]

206.    On August 15, 2023, after the market closed, the Company also filed a Notification

of Late Filing on Form 12b-25 with the SEC with respect to the Q2 2023 10-Q. The filing states

the "Company requires additional time primarily as a result of recent transition in the Company's

---

[12] After the Class Period, the Company falsely disclosed in its Form 10-K/A filed with the SEC on
April 29, 2024, that Vu resigned effective August 14, 2023.

management, including its principal financial officer and principal accounting officer [Vu].

Despite working diligently in an effort to timely file the Form 10-Q, the Company has been unable

to complete all work necessary to timely file the Form 10-Q."

207.    The Company's August 15, 2023 announcements, along with the disclosure of

Crespo's resignation just five months earlier on March 10, 2023, signaled to investors and the

market in general that there were undisclosed problems at the Company related to its financials.

208.    On this news, Ocugen's stock fell $0.04 per share, or 8.3%, to close at $0.44 per

share on August 16, 2023, damaging investors.  However, the full truth regarding the Company's

financials was not revealed and Defendants continued to issue false and misleading statements.

**The Restatement Announcement**

209.    On April 1, 2024, after the market closed, Ocugen filed with the SEC a current

report on Form 8-K (the "Restatement Announcement"). The Restatement Announcement stated

the following:

> In connection with the preparation of the financial statements of Ocugen,
> Inc. (the "Company") for the year ended December 31, 2023, the Company,
> in consultation with its independent registered public accounting firm, Ernst
> & Young LLP ("EY"), identified certain accounting errors related to the
> application of U.S. GAAP to certain agreements with one of its business
> partners related to a collaboration agreement.
>
> On April 1, 2024, the Audit Committee of the Board of Directors (the
> "Audit Committee"), based on the recommendation of management and
> after consultation with EY, ***concluded that the Company's previously-
> issued audited consolidated financial statements for each fiscal year
> beginning January 1, 2020*** and its previously-issued unaudited interim
> condensed consolidated financial statements for each of the first three
> quarters in such years, as well as the associated earnings releases and
> investor presentations or other communications ***describing such financial
> statements, were materially misstated and, accordingly, should no longer
> be relied upon***.
>
> ***The Company intends to restate its consolidated financial statements as
> of and for the year ended December 31, 2022, in connection with the filing***

*of its 2023 Form 10-K. Similarly, the Company will include restated unaudited financial information for each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K* (each such annual and quarterly period to be restated, a "Restated Period").

The identified errors in each of the Restated Periods relate to the Company's accounting for the estimated costs in one of its collaboration arrangements. *These identified errors will result in a restatement of the following financial statement line item captions: Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities*.

The Company is currently not in a position to provide a reasonable estimate of the anticipated changes in its results of operations for the year ended December 31, 2023, for any Restated Period. However, the Company does not expect the errors to result in any impact on its cash position, cash runway, or financial projections.

*Additionally, the Company has determined that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023. As a result, the Company's Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.*

On April 1, 2024, the Company filed a notification of inability to timely file Form 10-K on Form 12b-25 due to additional time required for the Company to correct the errors described above and prepare restated financial statements. At this time, the Company expects to file the 2023 Form 10-K no later than April 16, 2024. However, there can be no assurance that the Company will be able to prepare restated financial statements and file the 2023 Form 10-K on the timeline anticipated, or that no additional errors will be identified.

Emphasis added.

210.    As mentioned in the Restatement Announcement, after market hours on April 1, 2024, the Company filed with the SEC a Notification of Late Filing on Form 12b-25. It stated, in pertinent part, the following:

In connection with the preparation of the financial statements of the Company for the year ended December 31, 2023, the Company identified certain accounting errors relating to the application of U.S. GAAP to certain

agreements with one of its business partners related to a collaboration agreement. As a result, the Company intends to restate its financial statements for the year ended December 31, 2022 and for each of the first three quarters of 2022 and 2023 in the 2023 Form 10-K, the review and preparation of which is currently ongoing. Given the scope of the process to prepare the restatements and related disclosures, the Company requires additional time to prepare and review its financial statements and other disclosures in its 2023 Form 10-K. Therefore, the Company is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024.

211.    On this news, Ocugen's stock fell $0.16 per share, or 10.38%, to close at $1.38 per share on April 2, 2024, damaging investors.

**The Restatement**

212.    The Company issued the restated financial statements in its 2023 10-K filed with the SEC on April 16, 2024.

213.    The 2023 10-K also did not disclose the identity of the counterparty to the collaboration agreement that was incorrectly accounted for in the Company's previously issued financial statements but it revised its "License and Development Agreements" disclosure to only include one agreement (containing several amendments) with CanSinoBIO, which Ocugen identified as the only one within the scope of ASC 808 (emphasis added):

*Co-Development and Commercialization Agreement with CanSino Biologics, Inc.*

The Company entered into a co-development and commercialization agreement with CanSino Biologics, Inc. ("CanSinoBIO") with respect to the development and commercialization of the Company's modifier gene therapy product candidates, OCU400, OCU410, and OCU410ST. The co-development and commercialization agreement was originally entered into in September 2019 ("the Original CanSinoBIO Agreement") with regards to OCU400, and was subsequently amended in September 2021 and November 2022 ("the Amendments"), to include OCU410 and OCU410ST, respectively. The Company concluded that the Original CanSinoBIO Agreement and the Amendments are separate contracts (collectively referred to as the "CanSinoBio Agreements"). Pursuant to the CanSinoBIO Agreements, the Company and CanSinoBIO are collaborating on the development of the Company's modifier gene therapy platform. CanSinoBIO is responsible for the chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products and

is responsible for the costs associated with such activities. CanSinoBIO has an exclusive license to develop, manufacture, and commercialize the Company's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory"), and the Company maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside the CanSinoBIO Territory (the "Company Territory").

***

*Accounting analysis and revenue recognition*

***The Company determined the collaboration arrangements with CanSinoBIO, are within the scope of ASC 808 and has analogized to ASC 606 to account for CanSinoBIO's access to its IP as well as data generated in connection with the co-development activities to be undertaken by Ocugen.*** These elements of the arrangements are not distinct and are accounted for as a single performance obligation.

The non-cash consideration to be received related to the Company's satisfaction of the performance obligations includes but is not limited to services relate to chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products through completion of pre-clinical, clinical, regulatory, and other commercialization readiness services. The estimated market value of the co-development services to be performed by CanSinoBIO, represents variable consideration that is included in the transaction price. The Company recognizes collaborative arrangement revenue over time using an input method using ratio of costs incurred to date compared to total estimated costs required to satisfy the performance obligations under the CanSinoBIO Agreements.

The Company constrained the transaction price related to certain future co-development services and future royalties, as it assessed that it is probable that the inclusion of such variable consideration could result in a significant reversal of cumulative revenue in future periods. The variable consideration is reevaluated at each reporting period and as changes in circumstances occur.

The services provided by CanSinoBIO are recorded as incurred and the difference between the revenue and expense recognized is recorded on the Company's balance sheet as a contract liability within Accrued expenses and other current liabilities. ***The related revenue recognized was recorded in the consolidated statements of operations and comprehensive loss as collaborative arrangement revenue and was approximately $6.0 million and $2.5 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively. The related expense incurred for services provided by CanSinoBIO was recorded in the consolidated statements of operations and comprehensive loss as research and development expense and was approximately $5.3 million***

65

*and $9.1 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively.*

The contract liability was $10.5 million and $11.2 million as of December 31, 2023 and December 31, 2022, respectively. Revenue recognized for the year ended December 31, 2023, that was included in the contract liability balances as of January 1, 2023 was approximately $6.0 million. Revenue recognized for the year ended December 31, 2022, that was included in the contract liabilities balances as of January 1, 2022, was approximately $2.5 million.

214.    The financial statement impact of the restatement is summarized in the Balance Sheet and Income Statement Charts set forth below:

Balance Sheet Chart

| (000s, except per share amts.) | Q1 22 | Q2 22 | Q3 22 | 2022 | Q1 23 | Q2 23 | Q3 23 |
|---|---|---|---|---|---|---|---|
| **Current liabilities** | | | | | | | |
| Originally reported | $ 7,687 | $ 10,338 | $ 14,907 | $ 18,460 | $ 15,683 | $ 13,460 | $ 11,136 |
| Restated | $ 13,301 | $ 17,963 | $ 24,523 | $ 28,531 | $ 26,582 | $ 24,499 | $ 19,730 |
| Under/(over) stated $ | $ 5,614 | $ 7,625 | $ 9,616 | $ 10,071 | $ 10,899 | $ 11,039 | $ 8,594 |
| Under/(over) stated % | 42.2% | 42.4% | 39.2% | 35.3% | 41.0% | 45.1% | 43.6% |
| | | | | | | | |
| **Accumulated Deficit** | | | | | | | |
| Originally reported | $ 149,686 | $ 169,157 | $ 191,079 | $ 213,018 | $ 229,516 | $ 252,441 | $ 266,603 |
| Restated | $ 155,300 | $ 176,782 | $ 200,695 | $ 223,089 | $ 240,415 | $ 263,480 | $ 275,197 |
| Under/(over) stated $ | $ 5,614 | $ 7,625 | $ 9,616 | $ 10,071 | $ 10,899 | $ 11,039 | $ 8,594 |
| Under/(over) stated % | 3.6% | 4.3% | 4.8% | 4.5% | 4.5% | 4.2% | 3.1% |
| | | | | | | | |
| **Total Stockholders' Equity** | | | | | | | |
| Originally reported | $ 131,129 | $ 114,108 | $ 95,303 | $ 84,052 | $ 75,800 | $ 70,281 | $ 58,395 |
| Restated | $ 125,515 | $ 106,483 | $ 85,687 | $ 73,981 | $ 64,901 | $ 59,242 | $ 49,801 |
| Under/(over) stated $ | $ (5,614) | $ (7,625) | $ (9,616) | $ (10,071) | $ (10,899) | $ (11,039) | $ (8,594) |
| Under/(over) stated % | (4.5%) | (7.2%) | (11.2%) | (13.6%) | (16.8%) | (18.6%) | (17.3%) |
| | | | | | | | |
| **Current Ratio** | | | | | | | |
| Originally | 17.96 | 11.86 | 7.21 | 5.34 | 5.38 | 5.46 | 5.08 |
| Post restatement | 10.38 | 6.82 | 4.38 | 3.45 | 3.18 | 3.00 | 2.87 |
| Under/(over) % | (73.0%) | (73.8%) | (64.5%) | (54.6%) | (69.5%) | (82.0%) | (77.2%) |

Income Statement Chart

| (000s, except per share amts.) | Q1 22 | Q2 22 | Q3 22 | Q4 22 | 2022 | Q1 23 | Q2 23 | Q3 23 |
|---|---|---|---|---|---|---|---|---|
| **Collaborative arrangement revenue** | | | | | | | | |
| Originally reported | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Restated | $ 500 | $ 643 | $ 466 | $ 879 | $ 2,488 | $ 443 | $ 485 | $ 3,699 |
| Under/(over) stated $ | $ 500 | $ 643 | $ 466 | $ 879 | $ 2,488 | $ 443 | $ 485 | $ 3,699 |
| | | | | | | | | |
| **R&D expenses** | | | | | | | | |
| Originally reported | $ 7,915 | $ 9,007 | $ 15,622 | $ 17,213 | $ 49,757 | $ 9,558 | $ 14,169 | $ 6,342 |
| Restated | $ 9,393 | $ 11,602 | $ 17,937 | $ 17,227 | $ 56,159 | $ 10,172 | $ 14,574 | $ 7,048 |
| Under/(over) stated $ | $ 1,478 | $ 2,595 | $ 2,315 | $ 14 | $ 6,402 | $ 614 | $ 405 | $ 706 |
| Under/(over) stated % | 15.7% | 22.4% | 12.9% | 0.1% | 11.4% | 6.0% | 2.8% | 10.0% |
| | | | | | | | | |
| **Loss from operations** | | | | | | | | |
| Originally reported | $ (18,034) | $ (19,565) | $ (23,119) | $ (24,150) | $ (84,868) | $ (17,751) | $ (23,733) | $ (15,424) |
| Restated | $ (19,030) | $ (21,576) | $ (25,110) | $ (23,355) | $ (89,071) | $ (18,035) | $ (23,540) | $ (12,431) |
| Over/(under) stated $ | $ (996) | $ (2,011) | $ (1,991) | $ 795 | $ (4,203) | $ (284) | $ 193 | $ 2,993 |
| Over/(under) stated % | (5.2%) | (9.3%) | (7.9%) | 3.4% | (4.7%) | (1.6%) | 0.8% | 24.1% |
| | | | | | | | | |
| **Other income (expense), net** | | | | | | | | |
| Originally reported | $ 15 | $ 94 | $ 1,197 | $ 2,211 | $ 3,517 | $ 1,253 | $ 808 | $ 1,262 |
| Restated | $ 15 | $ 94 | $ 1,197 | $ 961 | $ 2,267 | $ 709 | $ 475 | $ 714 |
| Under/(over) stated $ | $ - | $ - | $ - | $ (1,250) | $ (1,250) | $ (544) | $ (333) | $ (548) |
| Under/(over) stated % | 0.0% | 0.0% | 0.0% | (130.1%) | (55.1%) | (76.7%) | (70.1%) | (76.8%) |
| | | | | | | | | |
| **Net loss** | | | | | | | | |
| Originally reported | $ (18,019) | $ (19,471) | $ (21,922) | $ (21,939) | $ (81,351) | $ (16,498) | $ (22,925) | $ (14,162) |
| Restated | $ (19,015) | $ (21,482) | $ (23,913) | $ (22,394) | $ (86,804) | $ (17,326) | $ (23,065) | $ (11,717) |
| Over/(under) stated $ | $ (996) | $ (2,011) | $ (1,991) | $ (455) | $ (5,453) | $ (828) | $ (140) | $ 2,445 |
| Over/(under) stated % | (5.2%) | (9.4%) | (8.3%) | (2.0%) | (6.3%) | (4.8%) | (0.6%) | 20.9% |
| | | | | | | | | |
| **Loss per share** | | | | | | | | |
| Originally reported | $ (0.09) | $ (0.09) | $ (0.10) | $ (0.10) | $ (0.38) | $ (0.07) | $ (0.10) | $ (0.06) |
| Restated | $ (0.09) | $ (0.10) | $ (0.11) | $ (0.10) | $ (0.40) | $ (0.08) | $ (0.10) | $ (0.05) |
| Over/(under) stated $ | $ - | $ (0.01) | $ (0.01) | $ - | $ (0.02) | $ (0.01) | $ - | $ 0.01 |
| Over/(under) stated % | 0.0% | (10.0%) | (9.1%) | 0.0% | (5.0%) | (12.5%) | 0.0% | 20.0% |

215.    As shown above, ***the balance sheet impact for all periods was to increase current liabilities and decrease stockholder's equity by increasing accumulated deficit*** (*i.e.*, accumulated net losses from prior periods).  For example, with respect to the restated periods, Ocugen's current liabilities were understated by **35.3%-45.1%**; stockholder's equity was overstated by **4.5%-18.6%**; and accumulated deficit was understated by **3.1%-4.8%**.

216.    The Balance Sheet chart also summarizes the effect of the misstatements on the Company's current ratio, which is calculated as the ratio of current assets to current liabilities.

Current ratio is a liquidity ratio that measures a company's ability to pay short-term obligations or those due within one year. Investors use current ratio to assess the financial health of a company. Companies with a high current ratio are well positioned to pay their debts in the short-term, while companies with a low current ratio may be at risk of default. Based on the restatement, ***Ocugen's current ratio was overstated*** by as much as **54.6%-82.0%** for all restated periods.

217.    The misstatements of the financial statements date back at least to the beginning of the Class Period. The restatement shows a $4.6 million adjustment, increasing the December 31, 2021 balance of the accumulated deficit, which represents the cumulative misstatement in the previously issued financial statements.

218.    As shown above, the income statement impact ***was to increase R&D expenses, loss from operations, net loss, loss per share, and collaboration revenue and decrease other income***. For example, R&D expenses were understated by as much as **0.1%-22.4%** for all restated periods; loss from operations was understated by as much as **5.2%-9.3%** for Q1 2022 through Q3 2022 and **1.6%-4.7%** for year-end 2022 through Q1 2023; net loss was understated by as much as **.6%-9.4%** for Q1 2022 through Q2 2023; loss per share increased by **9.1%-10%** for Q2 2022 through Q3 2022 and **5.0%-12.5%** for year-end 2022 through Q1 2023. While collaboration revenue increased by **100%** for the restated periods, other income (expense), net was overstated by as much as **55.1%-130.1%** for Q4 2022 through Q3 2023.

**Internal Control Over Financial Reporting and Disclosure Controls and Procedures**

219.    During the Class Period, Ocugen disclosed in its 10-Ks that its internal control over financial reporting was effective at the end of each calendar year. Moreover, in each 10-K, Ocugen also disclosed that its disclosure controls and procedures were effective.

220.    In its April 1, 2024 8-K, the Company disclosed the existence of a material weakness during the restated periods (Q1 2022 – Q3 2023) and as of December 31, 2023 (emphasis added):

> Additionally, the Company has determined that *the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023. As a result, the Company's Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.*

221.    The 2023 10-K acknowledges that as a result of a material weakness, which existed as of December 31, 2022 and 2023, Ocugen's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2023 (emphasis added):

> **Evaluation of Disclosure Controls and Procedures**
>
> *… Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K and as of the end of the prior year, our disclosure controls and procedures are not effective because of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements….*
>
> ***
>
> **Management's Annual Report on Internal Control Over Financial Reporting**
>
> ***
>
> *… Based on this assessment, management concluded that our internal control over financial reporting was not effective as of December 31, 2023 and December 31, 2022 as a result of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements. Specifically, we did not effectively design and operate controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received.*
>
> ***

69

**Remediation**

In order to remediate the material weakness, the Company's management plans to improve the design and operation of their controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received under collaborative arrangements. Specifically, the Company plans to implement the following: dedicating personnel resources with the appropriate level of proficiency to review any new arrangements on a timely basis; obtaining relevant information from third parties on a timely basis, including actual costs incurred, actual noncash consideration received, and estimates to complete; and increasing the level of review activities over the accounting for collaborative arrangements during the financial statement close process….

222.    In its April 1, 2024 8-K, the Company disclosed that its Q1 2020 through Q3 2023 financial statements should not be relied upon. Moreover, Ocugen made no changes to its internal control over financial reporting during the Class Period. ***Therefore, the material weakness dates back to at least 2020, the beginning of the Class Period***.

223.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and the other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

224.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Ocugen securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of Defendant Musunuri's immediate family and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

225.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

226.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

227.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

228.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

229.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

230.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

231.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

232.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

233.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

235.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

236.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

237.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

238.    Defendant Musunuri, who is CEO and Chairman of the Board of Directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and

disclose the true facts in the statements made by Defendants to members of the investing public, including Plaintiffs and the Class.

239.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

240.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

241.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

242.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against Defendant Musunuri

243.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.    During the Class Period, the Defendant Musunuri participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his position as CEO and Chairman of the Board, he knew the adverse non-public information about the Company's materially false and misleading statements, as alleged herein.

245.    As an officer of a public business, Defendant Musunuri had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

246.    Because of his position of control and authority as CEO and Chairman of the Board, Defendant Musunuri was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's financial statements. Throughout the Class Period, Defendant Musunuri exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendant Musunuri therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

247.    By reason of the above conduct, the Defendant Musunuri is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  October 4, 2024                             Respectfully submitted,

**POMERANTZ LLP**

/s/ *Brenda Szydlo*
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

***Lead Counsel for Plaintiffs and the Proposed Class***

DocuSign Envelope ID: 99917B45-62D3-414A-AE9C-EFB5044423E2

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Stephen Gary Mansfield_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Ocugen Inc. ("Ocugen") and authorize the

filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Ocugen securities at the direction of plaintiffs' counsel

or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Ocugen securities during the Class Period as specified in the

Complaint, including providing testimony at deposition and trial, if necessary.  I understand that

the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Ocugen securities during the Class

Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of

the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed _____4/24/2024_____
              **(Date)**

                                        DocuSigned by:

                                        *Stephen Gary Mansfield*
                    _____F4817D5023BB447..._____
                              **(Signature)**

                    Stephen Gary Mansfield
                    _____
                              **(Type or Print Name)**

**Ocugen, Inc. (OCGN)**                                                    **Stephen Gary Mansfield**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | Common Stock | 3/26/2024 | 25,000 | $2.0000 |
| Purchase/Acquisition | Common Stock | 3/26/2024 | 25,000 | $2.0000 |