### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE OCUGEN, INC. SECURITIES LITIGATION** | Case No. 2:24-cv-01500-KBH |
| | **CLASS ACTION** |
| **THIS DOCUMENT RELATES TO: 2:24-CV-01500-KBH (PATTERSON)** | |

**HODGE, J.**                                                                                       July 29, 2025

### MEMORANDUM

Lead Plaintiff Farhan Beig[1] ("Plaintiff") brings this class-action lawsuit individually and on behalf of all others similarly situated against Ocugen Inc., Shankar Musunuri, Sanjay Subramanian, Jessica Crespo, Quan Vu, and Michael Breininger for violations of the Securities Exchange Act of 1934 ("Exchange Act").[2] Defendants Ocugen, Inc. and Shankar Musunuri (collectively, "Defendants") have filed a Motion to Dismiss the Amended Class Action Complaint ("Motion"). (ECF No. 40.) Plaintiff opposes the Motion. (ECF No. 42.) Plaintiff alleges that the Defendants engaged in conduct in violation of the Exchange Act between May 8, 2020, and April 1, 2024 ("Class Period"). (ECF No. 36 ¶ 1.) Specifically, Plaintiffs bring claims against Defendants for violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Count I), along with a violation of Section 20(a) of the Exchange Act against Defendant Musunuri only (Count II). After having considered the arguments of the parties in their briefings, the Court grants the Defendants' Motion to Dismiss. The basis for the Court's determination is as follows.

---

[1]   Farhan Beig was appointed as Lead Plaintiff by this Court on August 6, 2024. (ECF No. 27.)
[2]   On October 16, 2024, the parties informed the Court that Defendants Subramanian, Vu, Breininger, and Crespo were voluntarily dismissed from this action. (ECF No. 37.) Therefore, the only remaining defendants are Ocugen, Inc. and Musunuri. (*Id.*)

I.      **FACTUAL BACKGROUND**[3]

Ocugen, Inc. ("Company") is a biotechnology company with approximately 80 employees that focuses on developing gene therapies to address retinal diseases. (ECF No. 36 ¶ 40.) Defendant Musunuri is the co-founder, Chief Executive Officer ("CEO"), Chairman of the Board and controls the Company. (ECF No. 36 ¶ 41.) Subramanian was the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until March 18, 2022. (ECF No. 36 ¶ 32.) Crespo was the Company's Chief Accounting Officer ("CAO") from March 18, 2022, through March 7, 2023. (ECF No. 36 ¶ 33.) Vu was the CFO and Chief Business Officer ("CBO") from March 6, 2023 through August 14, 2023. (ECF No. 36 ¶ 34.) Breininger was the Corporate Controller, interim Chief Accounting Officer, and Principal Financial Officer from September 15, 2023, to the present. (ECF No. 36 ¶ 35.) Arun Upadhyay was the Chief Scientific Officer during portions of the Class Period. (ECF No. 36 ¶ 55.)[4]

There are two main topics within the Class Period that are relevant to the case at hand. The first relates to the Company's Q2 2023 10-Q[5] and the second relates to the CanSinoBIO Agreement, a collaborative agreement between the Company and CanSino Biologics Inc. ("CanSinoBIO") for the development of products. The Court notes that while Plaintiff includes a plethora of factual background in their Amended Complaint, many of these facts are irrelevant to the Court reaching a decision on the issue before it. Specifically, Plaintiff pleads only loss causation, a necessary element of a securities claim, for two corrective disclosures issued on

---

[3]     The Court adopts the pagination supplied by the CM/ECF docketing system.
[4]     Plaintiff does not provide the dates that Upadhyay served as Chief Scientific Officer.
[5]     A 10-Q is a quarterly report that companies submit to the SEC in compliance with the Exchange Act. *See General Instructions*, Securities and Exchange Commission, https://www.sec.gov/files/form10-q.pdf (last visited July 28, 2025).

August 15, 2023 and April 1, 2024. The Court will therefore only address the facts from this relevant period and related to those statements made in those disclosures.

### i.      Q2 2023 10-Q

Plaintiff alleges that Confidential Witness 1 ("CW1") worked at Ocugen's headquarters in Malvern, Pennsylvania. (ECF No. 36 ¶ 53.) CW1 was a financial planning and analysis manager. (*Id.*) CW1's responsibilities included preparing forecasts based on information such as "the costs per patient in the clinical studies, numbers provided to CW-1 from R&D,[6] and calculations of costs based on research timelines." (ECF No. 36 ¶ 54.) The Company would often run clinical trials to evaluate their products. (*Id.*) CW1 reports that the initiation dates of trials were often changed or adjusted by the Company, which, in turn, should have required a change in the financial estimates. (ECF No. 36 ¶ 55.) When CW1 would present these changed projections to Defendant Musunuri, CW1 alleges that the Defendant Musunuri and Upadhyay were furious and "came up with their own numbers and estimates without any basis for doing so." (ECF No. 36 ¶ 56.) CW1 makes several allegations related to the forecasts generated by the Company, specifically that "there were times the forecasts they used in the investor calls contradicted the forecasts we put together in the finance department." (ECF No. 36 ¶ 57.) Furthermore, CW1 alleges that Musunuri "kept contradicting timelines that could not be hit and if you look at the results, they knew they couldn't be hit." (ECF No. 36 ¶ 61.) CW1 alleges that they were shut down from accessing R&D after they expressed their concerns to Defendant Musunuri. (ECF No. 36 ¶ 62.)

CW1 alleges that during a quarterly earnings conference call held on February 27, 2023,[7] Musunuri stated numbers that contradicted the finance department's projections. (ECF No. 36 ¶

---

[6]      R&D refers to the "research and development group" at the Company. (ECF No. 36 ¶ 54.)
[7]      CW1 does not specifically note that this took place during the conference call on February 27, 2023, rather, it was clarified by Plaintiff in their Amended Complaint that the call *likely* took place on February 27, 2023. (ECF No. 36 ¶ 63 n.2 (emphasis added).)

63.) Afterwards, CW1 wrote a twenty (20) page report with Frank Clifford, the head of Financial Planning and Analysis at the time, spelling out what was wrong with the forecasts provided. (ECF No. 36 ¶ 63.) In early March 2023, Musunuri held a meeting in his office with he and Upadhyay "on one side" and Clifford, Crespo, and some other finance executives "on the other side." (ECF No. 36 ¶ 65.) CW1, who was not present during this meeting, heard about it afterwards from Crespo. CW1 alleges that during the meeting, Crespo reported that she was berated by Musunuri and Upadhyay for "not towing the company line." (ECF No. 36 ¶ 65.) Shortly afterwards, the Company reported in a Form 8-K[8] that Crespo resigned on March 7, 2023 "to pursue new opportunities." (ECF No. 36 ¶ 67.) After this, Vu took over as CFO. (*Id.*)

In July or August 2023, Vu stopped by CW1's desk and informed CW1 that Vu would not be signing the Q2 2023 10-Q. (ECF No. 36 ¶ 68.) After a few weeks, CW1 saw members of security come and escort Vu out of his office. (ECF No. 36 ¶ 68.) Plaintiff alleges that the reason for Vu's termination was his unwillingness to sign the Q2 2023 10-Q. (*Id.*)

Confidential Witness 2 ("CW2") was an Executive Assistant to CFO Vu. (ECF No. 36 ¶ 70.) CW2 also periodically worked for Musunuri. (ECF No. 36 ¶ 70.) CW2 states that Vu discovered "something deeply disturbing involving what CW-2 understood to be misrepresentations to the public. (ECF No. 36 ¶ 71.) Vu told CW2 "that something did not add up." (ECF No. 36 ¶ 71.) Vu also told CW2 that he alerted the board to his discovery and CW2 believed the board contacted Ernst & Young[9] to conduct an investigation. (ECF No. 36 ¶ 72.) Plaintiff alleges that Vu refused to tell CW2 or anyone else what the alleged misrepresentations

---

[8] Form 8-K is a reporting document to satisfy reporting obligations under Section 12 or 15(d) of the Exchange Act and for "reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101)." *General Instructions*, Securities and Exchange Commission, https://www.sec.gov/files/form8-k.pdf (last visited July 28, 2025).

[9] Ernst & Young LLP ("EY") is an independent registered public accounting firm. (ECF No. 36 ¶ 209.)

were. (ECF No. 36 ¶ 73.) In Mid-June 2023, Musunuri allegedly cut off all communication with Vu and CW2. (ECF No. 36 ¶ 74.) Vu was eventually terminated in August 2023. (ECF No. 36 ¶ 75.) After Vu's termination, other people in the finance department were asked to sign off on the Q2 2023 10-Q but they refused. (ECF No. 36 ¶¶ 75, 77, 78.) Because of the refusals to sign the Q2 2023 10-Q, the Company was unable to file their quarterly report that ended June 30, 2023 with the SEC. (ECF No. 36 ¶ 80.) On August 15, 2023, the Company filed a notification of late filing with the SEC. (ECF No. 36 ¶ 80.) The stated reason for the delayed filing was "primarily as a result of recent transition in the Company's Management." (ECF No. 36 ¶ 80.) Plaintiff alleges that the filing did not disclose that Vu allegedly refused to sign the Q2 2023 10-Q due to fraud and that he was subsequently terminated. (ECF No. 36 ¶ 80.) The Company eventually filed their Q2 2023 10-Q which was signed solely by Musunuri in his capacity as Chairman, CEO, Co-Founder, Principal Executive Officer, and Interim Principal Financial Officer. (ECF No. 36 ¶ 81.) Plaintiff alleges that after the August 15, 2023 notification of late filing, the Company's Stock dropped by 6.8%.[10] (ECF No. 36 ¶ 208; ECF No. 42, at 35.)

    *ii.*    *CanSinoBIO Agreement*

In September of 2019, the Company entered into a co-development and commercialization agreement ("Agreement") with CanSinoBIO for the development of the Company's modifier gene therapy product candidates. (ECF No. 36 ¶ 83.) The Agreement was subsequently amended in September of 2021 and November of 2022 to include additional products. (ECF No. 36 ¶ 83.) The Agreement "provides that CanSinoBIO is responsible for the chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products and is responsible for the costs associated with such activities." (ECF No. 36 ¶ 84.) The Agreement further provides that

---

[10]     Plaintiff acknowledges that their Amended Complaint lists a math error and results in Plaintiff pleading an 8.3% decrease in stock price versus the correct 6.8% decrease. (*See* ECF No. 42, at 35 n.13.)

"CanSinoBIO has an exclusive license to develop, manufacture, and commercialize the Company's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the 'CanSinoBIO Territory'), and the Company maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside the CanSinoBIO Territory (the 'Company Territory')." (ECF No. 36 ¶ 85.) Plaintiff alleges that during the Class Period, the Company failed to properly account for the collaborative agreement with CanSinoBIO to "inflate the Company's financials." (ECF No. 36 ¶ 86.) Plaintiff further alleges that the failure to report the CanSinoBIO agreement was not in line with the Financial Accounting Standard Board ("FASB") Accounting Standard Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers.* (ECF No. 36 ¶ 87.) Plaintiff asserts that the Agreement

should have been accounted for under Accounting Standards Codification ("ASC") 606[11] and 808.[12] (ECF No. 36 ¶ 87-103.)

Confidential Witness 3 ("CW3") worked as an accounting manager and associate director of accounting from September 2021 through November 2023. (ECF No. 36 ¶ 104.) CW3 reported

---

[11] The relevant provisions of ASC 606 are as follows:

    a.    Step 1: Identify the contract(s) with a customer….
    b.    Step 2: Identify the performance obligations in the contract….
    c.    Step 3: Determine the transaction price—The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash. The transaction price also is adjusted for the effects of the time value of money if the contract includes a significant financing component and for any consideration payable to the customer. If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. (See paragraphs 606-10-32-2 through 32-27.
    d.    Step 4: Allocate the transaction price to the performance obligations in the contract….
    e.    Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation—An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's progress toward complete satisfaction of that performance obligation. (See paragraphs 606-1025-23 through 25-30.) ASC 606-10-05-4.

(ECF No. 36 ¶ 88.)

[12] The relevant provisions of ASC 808 are as follows:

In the period in which a collaborative arrangement is entered into … and all annual periods thereafter, a participant to a collaborative arrangement shall disclose all of the following:
    a.  Information about the nature and purpose of its collaborative arrangements
    b.  Its rights and obligations under the collaborative arrangements
    c.  The accounting policy for collaborative arrangements in accordance with Topic 235
    d.  The income statement classification and amounts attributable to transactions arising from the collaborative arrangement between participants for each period an income statement is presented.
Information related to individually significant collaborative arrangements shall be disclosed separately. ASC 808-10-50-1.

(ECF No. 36 ¶ 94.)

to CFO Subramanian, Crespo, and Andrew Walsh[13] throughout their tenure. (ECF No. 36 ¶ 105.) CW3 did the accounting for the CanSinoBIO agreement. (ECF No. 36 ¶ 107.) CW3 alleges that the CanSinoBIO relationship was the largest contractual relationship the Company had with an outside company. (ECF No. 36 ¶ 108.) CW3 also stated that there was limited access to anything related to the CanSinoBIO agreement. (ECF No. 36 ¶ 109.) CW3 further stated that "CW-3 and other Company accountants were allowed to contact every company in a business relationship with Ocugen except CanSinoBIO and it was CW-3's understanding that that had been the rule since the agreement was signed." (ECF No. 36 ¶ 109.) Furthermore, CW3 did not hear and saw no evidence of the estimates for the CanSinoBIO agreement being subject to internal and disclosure controls. (ECF No. 36 ¶ 110.)

On April 1, 2024, the Company announced in their Form 8-K that its Q1 2020 through Q3 2023 financial statements were materially misstated and should no longer be relied upon due to identified errors relating to the Company's accounting for the estimated costs in a collaboration arrangement.[14] (ECF No. 36 ¶ 111.) The Form 8-K disclosed that the identified errors would result in a restatement related to certain agreements with "one of the Company's business partners related to a collaboration agreement."[15] (ECF No. 36 ¶ 112.) In this April 1, 2024 Form 8-K, the Company disclosed that there were material weaknesses in its internal controls over financial reporting and that those disclosure controls and procedures were not effective as of December 31, 2023. (ECF No. 36 ¶ 114.) After the news was revealed to investors, Ocugen's stock fell by 10.38%. (ECF No. 36 ¶ 211.)

---

[13] Andrew Walsh was VP of finance at the Company. (ECF No. 36 ¶ 75.)
[14] Plaintiff alleges that this was the CanSinoBIO Agreement. (ECF No. 36 ¶ 112.)
[15] Id.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* But the court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Plaintiffs cannot prove facts they have not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Thus, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. Rather, a complaint must recite factual allegations enough to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.*

However, as compared to a standard Rule 12(b)(6) motion to dismiss, a complaint in a securities litigation must plead more than just "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). A plaintiff in a securities case must satisfy the heightened pleading

requirements of the Private Securities Litigation Reform Act ("PSLRA").[16] *See* 15 U.S.C. §§ 78u–4 *et seq*. The PSLRA provides two pleading requirements, both of which must be met to survive a motion to dismiss. *Id.* First, a complaint "must specify each misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d 242 at 252–53 (citing *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)); 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This is an exacting pleading standard for state of mind, also known as "scienter." *Avaya*, 564 F.3d 242 at 252–53 (citing *Tellabs*, 551 U.S. 308, 320). If a plaintiff fails to meet this heightened pleading requirement under the PSLRA, the complaint must be dismissed.

### III. DISCUSSION

Plaintiffs bring claims against Defendants for violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Count I), along with violations of Section 20(a) of the Exchange Act (Count II).

#### A. Section 10(b) and Rule 10b-5

Plaintiffs bring claims against Defendants under Section 10(b) and Rule 10b-5 of the Exchange Act, which prohibits fraud in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5(b). To state a claim under these Sections, Plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

---

[16] The Court notes that the PSLRA has replaced Rule 9(b) as the pleading standard governing private securities class actions. *See Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). However, the particularity requirement of Rule 9(b) is comparable and effectively subsumed by the PSLRA. *Id.*

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

Defendants and Plaintiffs make several arguments related to alleged Exchange Act violations. Because Plaintiffs only plead loss causation as to the August 15, 2023, and April 1, 2024 corrective disclosures, (*see* ECF No. 42, at 43), the Court will only consider those statements in those corrective disclosures in determining whether there was a securities violation.

### i. Materiality

Alleged misrepresentations are not actionable if the statements are immaterial. *Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459-60 (D. N.J. 2024) (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278 (3d Cir. 2010)); 15 U.S.C. § 78u-5(c). The Court "must distinguish material representations from statements that 'constitute no more than puffery and are understood by reasonable investors as such.'" *Id.* (citing *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020)). "A statement or omission of fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* at 459 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

In the present case, Defendant's argue that all the alleged misstatements are immaterial because reactions following disclosure show that Ocugen's stock increased shortly after the corrective disclosures, indicating that the statements, false or not, were not material. (ECF No. 40, at 35-44.) Plaintiff, on the other hand, argues that the pleadings sufficiently plead materiality, in that there were material alterations to the Company's "R&D expenses, loss from operations, net loss, loss per share, and collaboration revenue and decrease other income" which affected Ocugen's stock price and was material to investors. (ECF No. 42, at 26.)

11

Because Defendants' argument is that the Company's stock price rebounded after the corrective disclosures, the Court first must decide on whether Exhibits G and H[17] of Defendant's Motion to Dismiss may be judicially noticed or considered at this stage. Exhibits G and H are the stock prices of the Company throughout the Class Period. (*See* ECF Nos. 40-8, 40-9.) When "decid[ing] a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). However, an exception to the general rule holds that when a document attached to a motion to dismiss is integral or explicitly relied upon in the complaint, the document can be considered without converting the motion into one for summary judgment. *Id.* The purpose of the rule against inclusion of documents is lack of notice to a plaintiff. *Id.* Where a plaintiff has actual notice and has relied on those documents in framing the complaint, that concern is dissipated. *Id.* "It is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to [their] complaint." *Id.* at 250.

Rule 201(b) of the Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute because [they are] either (1) generally known within the territorial jurisdiction of the trial court; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 201(b). Under Rule 201(c), Federal Rules of Evidence, a district court must take judicial notice if requested by a party and supplied with the necessary information. Rule 201(c). The Courts, in securities cases, often take

---

[17] Defendants attach multiple exhibits to their Motion to Dismiss (ECF No. 40), however, the Court makes no ruling as to the admissibility of those documents at this time because they are unnecessary for the Court's determination.

judicial notice of stock prices. *See, e.g., In re NAHC, Inc. Sec. Litig*, 306 F.3d 1314, 1331 (3d Cir. 2002); *Ieradi v. Mylan Lab'ys, Inc.*, 230 F3d 594, 600 n.3 (3d Cir. 2000). The stock price data provided by the Defendant is gathered directly from Nasdaq. (ECF Nos. 40-8, 40-9.) Plaintiff has not asserted that this source is unreliable. Neither could there be any reasonable dispute as to whether the official Nasdaq.com data is accurate. For these reasons, the Court will judicially notice and consider Exhibits G and H.

> [W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock. Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," if a company's disclosure of information has no effect on stock prices, "it follows that the information disclosed . . . was immaterial as a matter of law."

*Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)). Defendants rely on three cases, post-*Burlington*, within the Third Circuit to support their proposition. *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019); *Oran*, 226 F.3d at 283 (holding that a stock price increase four days following a disclosure was "dispositive of the question of materiality"); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 231-33 (D. N.J. 2002) (same). While there is no set time post-event that the Court is required to consider the stock price, courts within this Circuit have held that a rebound or increase between one and four days after disclosure would be a sign of immateriality. *Id.*

Plaintiff alleges two key dates as they relate to the loss suffered. First, is the August 15, 2023 corrective disclosure which revealed that then-CFO Quan Vu was no longer with the Company, along with a notification of late filing for Ocugen's Q2 2023 10-Q. On this news, Ocugen's stock fell $0.03 per share, or approximately 6.8% from $0.47 to $0.44 per share.

13

The second key date is the April 1, 2024 corrective disclosure which revealed that certain communications describing financial statements, along with the financial statements themselves, were materially misstated. This was primarily in regard to the CanSinoBIO Agreement. On this news, Ocugen's stock fell $0.16 per share, or 10.38%, to close at $1.38 per share, from $1.54.

The Court will take these two dates independently and look at the succeeding stock movement after their respective corrective disclosure. Starting first with the August 15, 2023, corrective disclosure, Ocugen opened at $0.47 and closed at $0.4440. (ECF No. 40-9, at 6.) The price of the stock did not rebound back to $0.47 until August 23, 2023, around six (6) trading days later. (ECF No. 40-9, at 6.) The Court concludes that Defendants' argument that the price rebounded six trading days after the corrective disclosure is not sufficient to warrant a dismissal at this stage solely on the grounds of materiality. This is bolstered by the fact that the price continued to decrease, with only momentary spikes, throughout the end of August and September. (ECF No. 40-9, at 5-6.)

The Court comes to a different conclusion as to the April 1, 2024 corrective disclosure, however. On April 1, 2024, Ocugen closed at $1.54. (ECF No. 40-9, at 2.) After the market closed, the Company released a corrective disclosure which resulted in the stock price opening at $1.44 on April 2, 2024. (*Id.*) The stock would eventually close at $1.38 on that same day. (*Id.*) However, on April 3, just one trading day after the corrective disclosure, the stock closed at $1.50, marking a 15% increase from the previous closing and largely recovering from the losses sustained after the corrective disclosure. (*Id.*) On April 4, 2024, the stock had recovered completely, plus some, opening at $1.56. (*Id.*) The Court finds, consistent with other cases within the Circuit, that a complete recovery in two (2) trading days would be evidence that the corrective disclosures were not material to then-investment decisions. *See S.E.C. v. Butler*, 2005 WL 5902637, at *11 (W.D.

Pa. April 18, 2005) ("the recovery of a substantial part of the decrease during the first day following [defendant's] announcement and regaining the entire initial loss within three (3) days, 'negates any inference of materiality, because it indicates that investors quickly determined that the "new" information was not material to then-investment decisions.'").

For the aforementioned reasons, the Court determines that the April 1, 2024 corrective disclosure is not material. However, Plaintiff has adequately pled that the August 15, 2023 corrective disclosure may have been material. Therefore, the Court must now determine whether the August 15, 2023 corrective disclosures satisfy the remaining pleading requirements of a securities violation.

### ii. Falsity

A statement is actionable under securities laws if it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459 (D. N.J. 2024) (citing *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)). Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). A duty to disclose arises in only three circumstances: "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000); *Silverstein v. Globus Med., Inc.*, 2016 WL 4478826, at *9 (E.D. Pa. Aug. 25, 2016).

Plaintiff's only argument regarding the August 15, 2023 corrective disclosure is that the statements within that disclosure "failed to disclose that [Vu] alerted the Board to his discovery of misrepresentations in the Company's yet-to-be-issued Q2 2023 10-Q (possibly as early as late

May/early June 2023) which led to an investigation, and that in July or August 2023, Vu was fired after informing Musunuri he would not sign the Q2 2023 10-Q." (ECF No. 42, at 30.) Defendants argue that the statements are not false because they satisfied their statutory disclosure obligations under Item 5.02(b) 8-K and they were not obligated to disclose the reasons for his departure with particularity. (ECF No. 40, at 38.)

>Line item 5.02(b) in an 8-K requires the following disclosure:
>
>(b) If the registrant's principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions, or any named executive officer, retires, resigns or is terminated from that position, or if a director retires, resigns, is removed, or refuses to stand for re-election (except in circumstances described in paragraph (a) of this Item 5.02), disclose the fact that the event has occurred and the date of the event.

*General Instructions Line Item 5.02*, Securities and Exchange Commission, sec.gov/files/form8-k (last visited July 26, 2025). "Silence, absence a duty to disclose, is not misleading under Rule 10b-5." *Oran*, 226 F.3d at 285. Plaintiff does not dispute the fact that Defendants disclosed Vu's departure along with the date of his departure. As far as statutory obligations, Defendants have satisfied them since they did, in fact, disclose the fact that "the event has occurred and the date of the event." Line Item 5.02(b). Plaintiff does not allege that there is insider trading, a statute requiring disclosure, nor that a prior disclosure [to August 15, 2023] was inaccurate. For this reason, the Court finds that there is no actionable misstatement with regard to the August 15, 2023 disclosure.

As the Court has already determined that Plaintiff's claims fail as a matter of law on materiality and actionability, it is not necessary for the Court to evaluate the further elements of a securities violation. Plaintiff has failed to meet their pleading burden under the PSLRA.

**B. Section 20(a)**

Plaintiff also brings claims against the Defendants under Section 20(a) of the Exchange Act, which imposes joint and several liability upon one who controls a violator of Section 10(b). *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006); 15 U.S.C. § 78t(a). In order to succeed on a claim under Section 20(a), a plaintiff must successfully plead a primary violation of Section 10(b) of the Exchange Act. *Id.*; *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 622 (E.D. Pa. 2009). Because the Court has determined that Plaintiff fails to plead a primary violation of Section 10(b), his Section 20(a) claim fails as well. *Anderson v. Stonemore Partners, L.P.*, 296 F. Supp. 3d 693, 704 (E.D. Pa. 2017). Thus, no further analysis is warranted.

IV. **CONCLUSION**

For the aforementioned reasons, Plaintiff has failed to satisfy the heightened pleading standard under PSLRA as the Amended Complaint fails to adequately plead materiality and falsity as to the alleged misstatements by Defendants. As a result, the Court will grant the Motion to Dismiss.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**